(No. 57880.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. WILLIAM H. LONG, Appellee.

*Opinion filed December 16, 1983.*

Neil F. Hartigan, Attorney General, of Springfield, and Joan C. Scott, State's Attorney, of Lewistown (John X. Breslin and Gary F. Gnidovec, of the State's Attorneys Appellate Service Commission, of Ottawa, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and Sue Augustus, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellee.

CHIEF JUSTICE RYAN delivered the opinion of the court:

Defendant, William H. Long, was convicted of burglary and sentenced to a term of three years' imprisonment following a bench trial in the circuit court of Fulton County. Before trial, defendant moved to suppress evidence on the ground that his detention and arrest were without probable cause, a warrant, or consent, and therefore in violation of rights guaranteed to him by the Illinois and United States constitutions. The trial court, after hearing testimony, denied the motion and allowed the evidence, having found that no illegal detention or arrest occurred before police officers had reasonable grounds to believe defendant had committed a crime. The appellate court, in a Rule 23 order (87 Ill. 2d

R. 23) finding that an illegal stop by the police had occurred, reversed and remanded for a new trial (110 Ill. App. 3d 1207). We granted the State leave to appeal under our Rules 315 and 612(b) (87 Ill. 2d Rules 315, 612(b)).

The central issue before us is whether the trial court's finding that there was no illegal stop constituted manifest error. The evidence presented at the hearing on defendant's motion to suppress shows the following.

On November 18, 1981, Deputy Sheriff Curtis Pierce reported at 8 a.m. for duty with the Fulton County sheriff's office in Lewistown. Upon arrival, he was informed that Keith Electric Company had been burglarized during the early hours of the morning. Several items, including a safe, had been taken from the Canton business.

At approximately 10 a.m., Pierce received a call reporting that a safe had been found in some weeds adjacent to a rural road. On a gravel road in Joshua Township, Pierce met Denny Pollitt, who had found the safe and called Pierce. Pollitt explained that he discovered the safe that morning while running traps. He added that he had been hunting in the area the night before, but had not seen the safe at that time. Pollitt led Pierce through the weeds to the safe. Pierce noticed a large amount of what appeared to be dried blood on the safe and observed that the safe seemed to have been hidden. Also noting a broken handle on the safe, and that a plate was missing from the bottom of the safe, he concluded that someone had tried to break into the safe. Pierce saw no marking on the safe that identified its owner.

Thinking that the person whose blood was on the safe might have been cut badly enough to require stitches, Pierce called the sheriff's office and requested that the local hospital be contacted concerning anyone who might recently have received stitches. Pierce than asked Pollitt whether he had noticed anything suspicious in the area.

Pollitt replied that he had seen a small car and a pickup truck with stock racks earlier.

As the two men talked, a truck drove by. Pierce decided to follow it for two reasons. First, he testified, the truck had stock racks like the one Pollitt had seen earlier. Second, they were on a dead-end road with one house near the end. He thought that the people in the truck might live in the house, and he planned to ask them whether they had seen or heard anything suspicious during the night. Pierce acknowledged that at this point, he had no reason to suspect that the truck's driver or passengers had committed any crime.

Pierce followed the truck for approximately one quarter of a mile. During this time, he could not see who drove the truck or how many passengers it carried. The truck passed the one house on the road and continued on into a lane leading into a field.

Pierce neither activated his squad car's Mars lights, sounded the siren, nor signaled the truck to stop in any manner. However, the truck pulled over to the side of the lane and stopped. Pierce testified that he pulled in behind the truck, got out of his squad car, and, planning to ask the occupants if they had seen anything suspicious, approached the driver's side of the truck.

Pierce then realized that he recognized the occupants of the truck. William Long, the defendant, had been driving, and riding with him were Denise Henderson, her small daughter, and Greg Lawver. Denise Henderson and her daughter sat in the middle, and Lawver was on the passenger side. Pierce noted that Lawver was moving his hands beneath a coat that lay across his lap. When Pierce asked to see Lawver's hands, Lawver raised them up, exposing a large, unstitched fresh cut on the palm of one hand.

Pierce asked defendant for some identification and his driver's license. When defendant replied that he did

not have his driver's license, Pierce requested that he come back to the squad car. Pierce ran a computer check by radio and learned that defendant had a valid driver's license. The license check took three or four minutes. When it was complete, Pierce told defendant, who had remained outside the car, that he could go back to his truck. Pierce did not ask defendant any of the questions he had planned earlier regarding the safe and possible suspicious sights or sounds during the night. He testified that, when he first followed the truck, he thought the occupants might live in the house on the road, but when he recognized defendant and the other passengers, he realized that they did not live there.

Pierce next asked Lawver to step back to his squad car. At the hearing, Pierce stated that because of the cut on Lawver's hand, he suspected a connection between Lawver and the safe that Pollitt had found. Lawver sat on the passenger side of the squad car while Pierce ran a computer license check on him. After advising Lawver of his *Miranda* rights, Pierce asked him where he had been the night before, how he had cut his hand, and what he knew about the Keith Electric Company burglary.

While Pierce was talking to Lawver it appears that the owner of the property which they were on approached. When Pierce asked him if the occupants of the truck had permission to be on the property, the owner said they did not. Lawver had earlier told Pierce they had permission to be there.

While Lawver was being questioned, Sergeant Daniel Daly, also of the Fulton County sheriff's office, arrived in response to a request from Pierce. Daly, who was aware of the Keith burglary, entered Pierce's squad car and listened for several minutes to the conversation with Lawver. The two police officers then stepped out of the car while Pierce briefed Daly on what he had discovered

so far. Pierce explained to Daly that the safe found nearby was smeared with blood and that Lawver had a fresh cut on his hand. Pierce also told Daly that the owner of the premises said he had not given defendant or Lawver permission to be there, contrary to Lawver's earlier statement.

At this time, Daly went to the truck and asked defendant to come back to his squad car. Defendant was read his *Miranda* rights, asked where he had been during the early hours of November 18, and asked whether he had burglarized Keith Electric Company. Defendant made a statement as to his whereabouts and denied involvement in the burglary.

Daly left defendant in the squad car while he went back to the truck and spoke with Denise Henderson. When asked what she knew about the Keith Electric Company burglary, Henderson responded that defendant and Lawver had told her that they had burglarized the business. She indicated that they had hidden the safe in the weeds nearby and now had returned to try to open the safe. She explained, however, that when they arrived and saw Pierce standing near the safe, they did not stop.

Daly returned to his squad car, questioned defendant further, and eventually confronted him with Henderson's story. Defendant continued to deny participation in the burglary. However, Daly placed him under arrest.

That afternoon, in the Fulton County sheriff's office, Denise Henderson signed a form consenting to a search of the apartment that she shared with defendant. Deputy Sheriff James C. Hill followed her to the upstairs apartment, where she directed him to a closet containing several items reportedly taken from Keith Electric Company. Hill seized these items, which included a portable television set and a box of snacks.

In his pretrial motion to suppress, defendant requested the exclusion of all physical evidence discovered

as a result of the allegedly illegal stop, as well as the statements later obtained from Lawver and Henderson. In support, he cited the right to be free from unreasonable search and seizure that is guaranteed by the fourth amendment to the United States Constitution and by article I, section 6, of the 1970 Illinois Constitution. The State has responded that if, under the facts presented, defendant was seized at all within the meaning of the fourth amendment, the seizure was a permissible investigatory stop, well within the rule of *Terry v. Ohio* (1968), 392 U. S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.

Before the decision in *Terry v. Ohio*, it was considered that the restraint of any person that amounted to seizure for fourth amendment purposes was invalid unless probable cause requirements were met. (See *Florida v. Royer* (1983), 460 U.S. 491, 498, 75 L. Ed. 2d 229, 236, 103 S. Ct. 1319, 1324.) With *Terry v. Ohio*, however, the United States Supreme Court recognized a limited exception to the probable cause requirement, which was intended to allow police to briefly detain a person for investigatory purposes and, if necessary for safety, to search that person for weapons. In *Terry*, the court explained that the exception to the probable cause requirement would arise in cases where police conduct could be deemed reasonable because the governmental interest justifying the seizure outweighed the intrusion on the individual's fourth amendment interests. (392 U.S. 1, 20-23, 20 L. Ed. 2d 889, 905-07, 88 S. Ct. 1868, 1879-81.) During the years since *Terry*, courts have used this balancing test to measure the legality of countless brief detentions by police, but the basic tenets justifying the *Terry* exception have remained unchanged. See *United States v. Place* (1983), 462 U.S. 696, 703, 77 L. Ed. 2d 110, 118, 103 S. Ct. 2637, 2642-43.

The *Terry* court provided further guidance by stating that an analysis of whether an officer's conduct was rea-

sonable requires a dual inquiry. The conduct constituting seizure or search must have been "justified at its inception, and *** reasonably related in scope to the circumstances which justified the interference in the first place." (392 U.S. 1, 20, 20 L. Ed. 2d 889, 905, 88 S. Ct. 1868, 1879.) To make these determinations, a court should consider whether the facts available to the police officer would warrant a man of reasonable caution to believe that the police action was appropriate. An objective standard applies, so the police officer seeking to justify the intrusion "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio* (1968), 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880. See also *People v. Smithers* (1980), 83 Ill. 2d 430, 434; *People v. Tassone* (1968), 41 Ill. 2d 7, 10.

These principles have been codified in our Code of Criminal Procedure of 1963:

"A peace officer *** may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense ***." (Ill. Rev. Stat. 1981, ch. 38, par. 107—14.)

(This provision was added to the Code in 1968 following the *Terry* decision (see 1968 Ill. Laws 218; *People v. Lee* (1971), 48 Ill. 2d 272, 278-79).)

In construing the above language, this court has further defined the reasonableness standard for police conduct in the *Terry*-stop context. In *People v. McGowan* (1977), 69 Ill. 2d 73, 78, this court stated that, viewed as a whole, the situation confronting the policeman must be so far from the ordinary that any competent officer would be expected to act quickly. The facts supporting the policeman's suspicions need not meet probable cause requirements, but they must justify more than a mere hunch. And, in *People v. Smithers* (1980), 83 Ill. 2d 430, 439, this court warned that

the facts should not be viewed with analytical hindsight, but instead should be considered from the perspective of a reasonable officer at the time that the situation confronted him.

Turning to the facts before us, we first must determine at what point in time the defendant here was "seized" within the meaning of the fourth amendment and, more specifically, *Terry v. Ohio.* In cases like this where courts have considered investigatory stops, analysis has most frequently focused on whether the search or frisk accompanying the stop was permissible in scope. That a stop did occur, in such cases, is usually not questioned, so the reviewing court ordinarily has no need to determine if or when a seizure occurred. (*E.g., Sibron v. New York* (1968), 392 U.S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889; *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *People v. Seymour* (1981), 84 Ill. 2d 24; *People v. Smithers* (1980), 83 Ill. 2d 430; *People v. McGowan* (1977), 69 Ill. 2d 73; see also 3 W. LaFave, Search and Seizure sec. 9.2(g), at 46-48 (1978 & Supp. 1983).) As a result, existing case law is unclear regarding what, precisely, constitutes a stop.

The *Terry* court did observe, however, that "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." (392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 905 n.16, 88 S. Ct. 1868, 1879 n.16.) Four members of the Supreme Court more recently have added that an officer does not violate the fourth amendment by merely approaching a person in public, asking him if he will answer questions, questioning him if he will listen, or introducing his answers as evidence in a criminal prosecution. (*Florida v. Royer* (1983), 460 U.S. 491, 497, 75 L. Ed. 2d 229, 236, 103 S. Ct. 1319, 1324 (opinion of White, J., joined by Marshall, Powell, and Stevens, JJ.).) Two other

members of the court also have explained that "characterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices." (*United States v. Mendenhall* (1980), 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (opinion of Stewart, J., joined by Rehnquist, J.).) Indeed, to the contrary, citizens have a duty to cooperate with law-enforcement officials who investigate a crime (*Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 133). Police questioning during such investigations does not in itself constitute a fourth amendment violation. See *People v. Miller* (1980), 89 Ill. App. 3d 973, 977; see also Ill. Rev. Stat. 1981, ch. 38, par. 31—8.

Before applying these principles to the case at bar, we note defendant's contention that an initial, unjustified stop occurred when Deputy Pierce continued to follow the truck past the one house on the road. Defendant maintains that when he pulled over and stopped the truck it was at Pierce's behest. Defendant's theory is that all evidence seized after and as a result of this stop must be excluded.

The State, on the other hand, claims that, if a *Terry* stop in fact occurred, it was not effected when defendant first stopped the truck and underwent the driver's license check. Instead, the State argues, the earliest time at which a stop might be found is when Sergeant Daly summoned defendant into his squad car (that is, sometime after Pierce had completed the license check and allowed defendant to return to his truck). The State's position is that the police officers by this time could articulate facts sufficient to justify a *Terry* stop. Therefore, according to the State, evidence discovered after and as a result of this later detention was permissibly obtained. Under the State's view, then, the trial court correctly denied defendant's motion to suppress.

The trial court specifically found that Pierce did nothing to cause the truck to stop. The court stated: "They were, based upon this record, *** free to drive away, had they decided to do so." We agree with the trial court's finding that no stop occurred when, in his squad car, Pierce followed defendant's truck and defendant voluntarily pulled over to the side of the road. A reviewing court will not disturb a trial court's finding in a hearing on a motion to suppress unless the trial court's finding was manifestly erroneous. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 165; *People v. Clay* (1973), 55 Ill. 2d 501, 505.) Here, where the officer merely followed defendant, without activating the light or siren on his squad car, we cannot find that the trial court's determination constitutes manifest error. Nor do we think Pierce intruded upon defendant's fourth amendment interests when he approached the truck to question the occupants. Finally, Pierce was certainly justified in running the license check when defendant failed to produce a driver's license. Since Pierce then allowed defendant, without condition, to return to the truck, it is clear that no *Terry* stop occurred at this point.

As defendant returned to the truck, Pierce asked Lawver to come back to his car. Defendant maintains that even if no illegal stop had occurred up to this point, he was unjustifiably detained in the truck while Pierce questioned Lawver in the squad car.

The evidence presented at the hearing below does not support defendant's position. Questions that might arise concerning Pierce's conversation with Lawver, of course, are not before this court. With respect to defendant, Pierce neither requested him to wait for Lawver, nor in any way prevented his departure. That defendant opted to wait for his companion does not bear on the legality of Pierce's conduct. We agree with the trial court that while Pierce questioned Lawver, the defendant still was free to drive away if he chose to do so.

We also agree with the trial court that when Daly later directed defendant to his squad car, the detention that resulted was not illegal. By this time, Daly knew that a safe had been taken in the early morning hours from Keith Electric Company. He was also aware that a safe had been found in a rural area later that morning by a hunter who had not seen the safe when he was in the area the night before. Daly by now knew that a pickup truck with stock racks had been seen in the area earlier and that a pickup truck with stock racks, driven by defendant, had now returned to the vicinity where the safe was found. Daly, moreover, knew that Lawver's assertion that the occupants of the truck had permission to be on the land had been denied by the owner of the premises. Finally, Daly at this point was aware that the safe found nearby was smeared with blood, while Lawver, who rode in the truck with defendant, had a large cut on one of his hands.

These facts, which Daly could have stated when he directed defendant to his squad car, need not work together to meet a probable cause requirement. They need only meet the lesser test of *Terry v. Ohio*. The relevant inquiry is whether a man of reasonable caution would find Daly's action appropriate, or, stated another way, whether Daly could point to specific and articulable facts, which together with reasonable inferences, reasonably warranted the intrusion. Answering this question affirmatively, we find that the requirements of *Terry* were met in this case. Under these circumstances, the governmental interest in questioning suspects near the scene of a recently committed crime outweighs the intrusion on defendant's fourth amendment interests.

In its brief, the State argues alternatively that, even if defendant were stopped impermissibly, the evidence obtained in the later search of the apartment was nevertheless admissible. The State contends that the police inevitably would have discovered this evidence anyway, and that,

therefore, it should not be suppressed. Because we hold that no illegal stop occurred, we do not reach this issue.

The judgment of the appellate court is reversed, and the judgment of the circuit court of Fulton County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*