THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. DAVID B. SINGER *et al.*, Defendants-Appellees.

Second District   Nos. 2—86—0421, 2—86—0422 cons.

Opinion filed June 12, 1987.

REINHARD, J., dissenting.

Philip L. DiMarzio, State's Attorney, of Sycamore (William L. Browers and Virginia M. Ashley, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

William P. Brady, of Gallagher, Fuenty & Klein, of De Kalb, for appellees.

JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, David Singer, was charged with the offense of burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—1(a)). Defendant, Robert Genis, was charged with the offense of theft (Ill. Rev. Stat. 1985, ch. 38, par. 16—1(d)(1)). Each defendant filed a motion to suppress evidence which was granted by the circuit court of De Kalb County.

The State appealed pursuant to Supreme Court Rule 604(a)(1) (103 Ill. 2d R. 604(a)(1)), and in each case filed a certificate of impairment. We consolidated these cases for purpose of review.

The sole issue presented for review is whether the trial court erred in granting the defendants' suppression motions, where the State argues the police officers were lawfully in defendants' room, the article seized was in plain view, and the officers had probable cause to believe that the seized item was connected to criminal activity.

In December 1985 the city of De Kalb police department was investigating burglaries which had recently occurred at J. P. Hannigan's Restaurant and Popcorn World, both in De Kalb, and the burglary of an ice cream shop in Sycamore. The cases were assigned to Detective Daniel Gerace.

The police arrested Thomas Boyce on Sunday, December 1, 1985, who gave them certain information in regard to the burglaries. Thomas Boyce had a brother, James Boyce, who resided in room 437 at a dormitory known as Douglas Hall on the campus of Northern Illinois University located in the city of De Kalb.

Early Monday morning, December 2, 1985, Detective Gerace accompanied by Detective Debra Pettit of the University security staff went to room 437 of Douglas Hall and talked to James Boyce. The officers had no search or arrest warrants in their possession. Detective Gerace testified he believed that once he discussed the burglaries with James Boyce in room 437 he felt the occupants of room 431, just a couple of doors down the hall in the dormitory, would "obviously be tipped off and there would be no way that we would recover that merchandise." The items the detectives were looking for were an electronic video poker game, a dart board, a coin box, and a popcorn container. Gerace had informed Pettit in general as to the burglaries and the items that were stolen.

The detectives went to room 431, and Detective Gerace knocked at the door. A voice called out "Come on in *** ." Gerace opened the door and the detectives stepped into a small dormitory room. There were two bunk-type beds, one on the right and one on the left, both high off the floor, maybe five feet. The room also had a closet and a desk. A person later identified as David Singer was in the bed on the right and a person later identified as Robert Genis was in the bed on the left.

Detective Gerace identified himself and introduced Detective Pettit. He told the occupants of the room they were investigating some stolen property and advised the occupants of their constitutional rights.

Detective Pettit saw a dart board[1] under the bed on the left and pointed it out to Gerace. Detective Gerace asked Mr. Singer if he could have permission to search the room. Singer's response was no; he told the detective he would rather have him get a search warrant. Detective Gerace then asked Detective Pettit to take Mr. Singer out of the room, which she did.

Gerace then went over to the cluttered area where Pettit had pointed, he bent over and looked down, he touched the dart game and touched the green army shirt that was on top of the poker game. In this regard he testified:

"A. I touched, I believe I touched the dart game, and I also touched the green army shirt that was on top of the poker game.

Q. You moved it off the poker game to see what was under it?

A. I knew what was under it. I removed it.

[1]The dart game was later determined to belong to one of the room occupants.

Q. But obviously it was hiding part of the game from your view; is that correct?

A. The army fatigue shirt, your Honor, was draped over the poker machine.

Q. What part of the poker machine could you see when the army shirt was over it?

A. The army shirt, the sleeves were removed, your Honor, from the complete shoulder all the way down. I could see part of the side, I could see part of the base of the poker machine.

Q. Could you see the buttons?

A. I don't believe I could see the buttons, no.

Q. So, what you're telling us is that—well, perhaps if I showed you the People's Exhibit Number 1 for identification, can you tell us what that is?

A. Yes. That's the poker video machine that I recovered at the dormitory room.

Q. What on that machine indicates that it's a poker video machine?

A. I'm not sure.

Q. So, what you're telling us is you saw an item underneath this shirt, but you didn't see anything on that item that in any way indicated it was a poker video machine.

A. This was obviously the same height, weight of the poker video machine. I knew immediately when I saw this item that it was a poker machine.

Q. And poker machines by themselves are not illegal.

A. As long as they're not stolen.

Q. In order to move this army shirt off the poker video machine did you have to reach underneath the bed to do that?

A. Well, like I say, the bed's off the ground. There were no items in front of the poker machine or on top of the poker machine except for the army jacket. I reached down and pulled it off. It was under the bed.

Q. Was that before Detective Pettit and Mr. Singer left the room?

A. I think they were leaving, or on their way out at that time. I don't recall the exact time I did that.

Q. Okay.

A. I asked them to leave, and then I made the move.

Q. And the move was to take the shirt off the poker machine. Did you move the machine out a little bit so Mr. Genis could see it?"

Detective Gerace moved the machine out a little so defendant Genis could observe it. He then questioned Genis regarding the burglary. Defendant Genis admitted the game was stolen. Detective Gerace exited the room with the game. Both defendants later gave statements. Subsequently, defendant Singer was charged with burglary, and defendant Genis was charged with theft. The video poker machine observed by Detective Gerace was determined to have been taken from the premises of J. P. Hannigan's Restaurant.

Counsel for defendant Genis filed a motion to suppress physical evidence in the circuit court. After a hearing, the trial court found that the officers were lawfully in the defendants' room and that the electronic video poker game was in plain view. Nonetheless, the trial court ruled that the seizure of the video poker game was constitutionally impermissible since no warrant had been obtained and no exigent circumstances existed. Thereafter, the State and defendant Singer stipulated that the evidence on his motion to suppress would be identical to that elicited on defendant Genis' motion. By stipulation, Judge John A. Leifheit agreed to adopt the findings and opinion prepared by Judge Meilinger in the Genis case. This appeal followed.

The State argues that the trial court erred in granting defendants' suppression motions where the officers were lawfully in defendants' room, the article seized was in plain view, and the officers had probable cause to believe that the seized item was connected to criminal activity. Therefore, the State reasons the seizure of the video poker machine was proper without the necessity of obtaining a warrant.

Defendant Singer has not filed a brief in this court. Defendant Genis contends that the search of his room was unreasonable and the item seized from his room should be suppressed as evidence against him because warrantless searches are *per se* unreasonable, citing *People v. Rinaldo* (1980), 80 Ill. App. 3d 433. Defendant Genis also contends that the evidence does not support the trial court's finding that the video poker machine was in plain view. He argues that the police witnesses were unable to observe the item in the room without bending down and looking under the bed and removing the shirt which covered the machine. He further argues that the item seized was commonplace and not contraband and therefore not an exception to the warrant requirement.

■■ A police officer may lawfully seize an item in plain view without a warrant if he views the object from a place where he has a right to be and if the facts and circumstances known to him at the time he acts give rise to a reasonable belief that the item seized constitutes

evidence of criminal activity. *People v. Loggins* (1985), 134 Ill. App. 3d 684, 688.

In the case at bar the trial court expressly found that the police officers were lawfully in the defendants' room and that the video poker machine was in plain view.

Nonetheless the trial court granted the suppression motion, under the belief that the police were required to secure the premises and obtain a warrant for seizure of the machine because no exigent circumstances existed. The trial court relied upon the cases of *People v. Keller* (1981), 100 Ill. App. 3d 255, and *People v. Rinaldo* (1980), 80 Ill. App. 3d 433.

In *People v. Keller* (1981), 100 Ill. App. 3d 255, the officer could see an engine and transmissions in the back of a garage and an Oldsmobile and two trucks. The State argued that the officers' observation of these items prior to entering the garage amounted to plain view and that therefore it was proper for the officers to enter the garage, seize the items and make further observations. On review, the appellate court pointed out that the mere presence of automobiles and automobile parts in a garage does not give rise to probable cause that they were stolen since these items are commonplace in auto-body repair shops and automotive service centers. 100 Ill. App. 3d 255, 261.

In *People v. Rinaldo* (1980), 80 Ill. App. 3d 433, we held that a police search of a sealed box found in the defendant's trunk was unjustified in the absence of a warrant since the search was nonconsensual, not part of an established inventory procedure or on the basis of plain view since the police had no firsthand knowledge of what was in the box.

In the recent case of *Arizona v. Hicks* (1987), 480 U.S. ___, 94 L. Ed. 2d 347, 107 S. Ct. 1149, the United States Supreme Court ruled that probable cause is required in order to invoke the "plain view" doctrine. In that case police had been called to an apartment where a person was struck by a bullet fired through the ceiling from the apartment above. Going upstairs, the police searched for the shooter, other victims, or for weapons. One of the officers observed that the apartment was squalid but nonetheless had two sets of expensive stereo components which were, therefore, out of place. The officer moved some of the components and recorded the serial numbers. He phoned these numbers to his department, which kept a computer list of stolen property. He was advised that some of the stereo equipment was stolen, and he seized it immediately and later obtained a warrant to search for other stereo equipment in the apartment which was seized. The defendant moved the trial court to suppress

the evidence, which the trial court did, and this suppression was affirmed by the court of appeals. The State Supreme Court denied leave to appeal. The State appealed to the United States Supreme Court, which affirmed the court of appeals.

In the *Hicks* case the State had conceded that "probable cause" was lacking. Similarly here we determine, based on the record before us, that the officers lacked probable cause to search the confines of room 431. Therefore, we are not confronted with the question of whether the requirement of the plain view doctrine has been met.

■ There is nothing in this record which demonstrates that the police had probable cause to conduct the search they conducted. Therefore, under the *Hicks* case the evidence must be suppressed, and the trial court was therefore correct in its judgment.

Affirmed.

NASH, J., concurs.

JUSTICE REINHARD, dissenting:

From a careful reading of the record and an analysis of the pertinent law, I respectfully dissent.

In order to understand the factual and procedural aspects of this case, it is necessary to briefly review the testimony of the police officers which reveals what they knew and what they saw. Additional facts in the record, but not contained in the majority opinion, must also be set forth for a complete appreciation of the issues presented. Only Detectives Pettit and Gerace testified at the hearing on the motion to suppress evidence.

It is undisputed that Detective Gerace was investigating three recent burglaries, one of which was of J. P. Hannigan's Restaurant from which an electronic video poker game was taken. At the time the police proceeded to dormitory room 431 where the defendants resided, one person was already under arrest for this burglary, and the detectives had just come down the dormitory hall after talking with the brother of the arrestee. Concerning property stolen in the burglary, Detective Gerace testified as follows:

> "Q. When you went to that room your intent was not to, or you didn't have enough evidence to arrest those people at that time, did you, when you went to the room initially?
>
> A. *We had knowledge that they were involved in these break-ins. We have knowledge that they had stolen property in the room.*

Q. Did you have enough that you could have gotten an arrest warrant?

A. I'm not sure.

Q. You didn't try, though?

A. No.

Q. How about a search warrant?

A. I didn't try.

* * *

Q. Did you know the make, model and the size, color, or anything else, any of those specifics about the poker game?

A. I had a good idea.

Q. What was the basis of your good idea?

A. I'm familiar with that type of video poker game. I've seen them in other establishments.

Q. And they're not illegal to possess?

A. Not that I know of.

Q. And a person can have one in their house or in the room and they're not violating any law.

A. As long as it's not stolen, yes.

Q. As long as they're not stolen. Certainly. But there was no way, you didn't have any information that differentiated the video game you were looking for from any other video game of a similar type, did you?

A. *I had information that the video game taken from J. P. Hannigan's may be up there.*

Q. But you didn't get a search warrant for it.

A. No."

(Emphasis added.)

The foregoing testimony was uncontradicted and unimpeached. It is also undisputed that when Detective Gerace knocked on the defendants' door, a voice from inside said "Come on in" and the detectives walked into the small dormitory room. Thus, consent was given to enter the room.

At this point, there is a divergence in the testimony of the detectives as to the sequence of the discovery of the video poker game. Detective Pettit stated that after Gerace read the defendants their rights, defendant Singer told Gerace he would rather have them get a search warrant in response to Gerace's request for permission to search the room. Detective Gerace, however, testified that after their entry into the room, the following took place:

"Q. Now, you get into the room, what happens? Who says what?

A. I identified myself and introduced myself and Detective Pettit. I told them why we were there.

Q. Did you ask them for identification, or did you ask them what their names were?

A. Yes, I did.

Q. And did they tell you?

A. Yes, they did.

Q. What happened then?

A. I told them the reason we were there.

Q. And what did you tell them?

A. We were investigating some stolen property involving—.

Q. Did you mention anything particularly that you were investigating?

A. I don't believe I did, no.

Q. And what happened then?

A. I advised them of their constitutional rights.

Q. And how did you do that?

A. Verbally.

Q. From memory, or off a card?

A. I'm not sure. One or the other.

Q. What happened then?

A. Detective Pettit pointed to some items underneath the bed. I observed several items underneath the bed. One in particular, a video game, poker video tame [sic]. Also an icecream [sic] light, a clock light that was on the foot of Mr. Genis' bed on the wall. There was a dart game there. A few other items.

Q. How did Detective Pettit point these items out to you?

A. I believe she said, 'Dan,' I turned around, she was pointing underneath the bed, and I glanced over there and looked at the items.

Q. She have the same view point as you did at that point?

A. Well, it's close quarters, but it actually may have been different. She was closer to the door, and I was closer to the other side of the room.

Q. One of the items you think you saw was the dartboard [sic].

A. There was a dartboard [sic] there.

Q. And where was that dartboard [sic] located in relation to this video game?

A. Video game was underneath the bed, the dartboard [sic] was on the floor also, as the video game. But I believe that was more towards the wall where the door was.

Q. How far away?

A. How far what?

Q. Were the dartboard [*sic*] and video game.

A. Three, four feet. I'm not sure.

Q. What did you do then?

A. I asked them if they had any stolen property in there.

Q. And they told you, 'No'?

A. That's true.

Q. And then what did you do or say?

A. I asked Mr. Singer if I could have permission to search the room.

Q. And what was his response?

A. His response was, 'No.'

Q. Did you direct that question only to Mr. Singer? Did you say, 'Mr. Singer, can I have permission to search your room'?

A. Most of the dialogue at that time was directed towards Mr. Singer.

Q. But my question was, prior to asking that question about searching the room, did you say, 'Mr. Singer, can I search your room'?

A. I believe I was looking at Mr. Singer at that time. He was the one responding to my questions. I was looking at him, and I asked him.

Q. And he told you he'd rather you go get a search warrant.

A. Yes.

Q. And at that point you had Detective Pettit remove him from the room; correct?

A. I asked Mr. Singer if he would exit the room, and I asked Detective Pettit to go out there with him while I spoke with Mr. Genis.

Q. You hadn't placed Mr. Singer under arrest at that point?

A. No.

\* \* \*

[Cross-Examination]

Q. At the point in time that you began questioning Mr. Genis concerning his involvement in the offenses that you were investigating, you had already observed the item depicted in People's Exhibit Number 1; is that right?

A. Yes.

Q. Subsequent to that did you determine that that in fact was the poker game that was taken during the J. P. Hannigan's burglary?

A. Yes.

Q. So, when you saw it for the first time and recognized it as being proceeds of a burglary, you were right; is that correct?

A. Yes, I was.

Q. Is that the point in time that you observed the items that you have described—the green shirt, the poker game, the dartboard [sic]?

A. Yes.

Q. So, it was within a few seconds of your entry into that room.

A. Right.

Q. And it was within a few seconds of your entry into that room by invitation of one or both of the defendants.

A. Yes.

Q. And it was after you observed these items that the conversation took place between yourself, Genis, and Singer concerning involvement in burglaries.

A. Yes.

Q. And it was after you observed these items that Mr. Singer claims that you should have a search warrant, or you should get a search warrant, in response to your question, 'Can I search the room.' Is that right?

A. Repeat that, please.

Q. You've indicated that Singer, at some point, says, 'Get a search warrant.'

A. Yes.

Q. You had already observed these items, however, prior to him making that statement, hadn't you?

A. Yes, I did observe them.

Q. Was there anything obstructing your view of these items when you entered the room?

A. No, there was not.

Q. Were they in plain view?

A. Yes, they were.

Q. Did you have to move anything in order tó be able to observe most particularly the poker game and the shirt?

A. No, I did not.

\* \* \*

[Redirect]

Q. Now, as far as these items being in plain view, would it be your testimony that anybody standing within, say, a three-foot radius of where you were standing in that room could have

seen the items that you've told us about?

MR. COOK: I'm going to object on the grounds it calls for this witness to speculate beyond any realm of—

THE COURT: Well, he can answer. I'll let him answer.

THE WITNESS: If you're looking for the items, anyone in that room could have seen them."

From this testimony it is clear that it was only after Gerace had observed the electronic video poker game that he asked permission to search the room, which was denied. Following this refusal, he then went across the room and removed a sleeveless shirt that was partly draped over the poker game. What then followed concerning the seizure of the poker game is quoted in the majority opinion.

Following the evidentiary hearing, the trial judge issued a letter of opinion indicating his finding that the detectives were lawfully in the defendants' room and that the electronic video poker game was in plain view. While I recognize that Gerace's testimony that he first viewed and recognized the poker game before he was denied permission to search the room conflicts with Pettit's testimony, the trial judge, as the trier of fact, found the video poker game was in plain view. That finding is supported by the evidence and should not be overturned unless manifestly erroneous. See *People v. Long* (1983), 99 Ill. 2d 219, 231, 457 N.E.2d 1252.

The "plain-view" doctrine authorizes the seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior fourth amendment justification and who has probable cause to suspect that the item is connected with criminal activity. (*Illinois v. Andreas* (1983), 463 U.S. 765, 771, 77 L. Ed. 2d 1003, 1010, 103 S. Ct. 3319.) The "plain-view" doctrine is grounded on the proposition that once police are lawfully in a position to observe an item firsthand, its owner's privacy interest in that item is lost. 463 U.S. 765, 771, 77 L. Ed. 2d 1003, 1010, 103 S. Ct. 3319, 3324; see *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022.

From the foregoing facts, I conclude the following: (a) Gerace was investigating a recent burglary where an electronic video poker game was taken; (b) Gerace had information that the defendants were involved in the burglary and that the electronic video poker game taken in the burglary was in the defendants' room; (c) the detectives were given permission to enter the room; and (d) Gerace, within seconds upon entering the room, could observe the poker game in plain view from a place where he had a lawful right to be before he was denied permission to search and before he walked over to the bed and re-

moved the shirt from the poker game.

Under these circumstances, the seizure of the poker game was authorized pursuant to the "plain-view" doctrine. Although the trial judge also concluded that the poker game was in plain view, he nevertheless erroneously concluded that the seizure was impermissible because there were no "exigent circumstances" to seize the poker game without first obtaining a search warrant.

Contrary to the trial judge's legal conclusion that Gerace still should have secured a search warrant, citing *People v. Keller* (1981), 100 Ill. App. 3d 255, 426 N.E.2d 930, *rev'd* (1982), 93 Ill. 2d 432, 444 N.E.2d 118, and *People v. Rinaldo* (1980), 80 Ill. App. 3d 433, 399 N.E.2d 1027, where, as here, the poker game was visible from a place where the detectives had a lawful right to be upon permission, seizure was appropriate without the inconvenience of first securing a search warrant under these circumstances. (See *Arizona v. Hicks* (1987), 480 U.S. ___, ___, 94 L. Ed. 2d 347, 355, 107 S. Ct. 1149, 1153.) *Keller* and *Rinaldo* are not factually apposite and, therefore, not controlling.

Finally, the majority cites the recent case of *Arizona v. Hicks* (1987), 480 U.S. ___, 94 L. Ed. 2d 347, 107 S. Ct. 1149, in apparent support of the conclusion that the police did not have "probable cause to conduct the search they conducted." As contrasted to *Hicks*, where the police had to move stereo equipment to read the serial numbers to determine if the equipment was stolen *without any prior evidence of it being stolen*, the police here were investigating a burglary where a poker game was taken, they had information that it was in the defendants' dormitory room, and Detective Gerace could identify it as an electronic video poker game upon his entry into the room by consent. This certainly is more than the mere suspicion present in *Hicks*, and it is, in my opinion, sufficient probable cause in order to invoke the "plain-view" doctrine. While the police obviously could not know beyond a reasonable doubt whether this was the actual video poker game taken in the burglary when they first observed it, based on all the information they had, this constituted the probable cause necessary for the purposes of the "plain-view" doctrine.

For the foregoing reasons, I would reverse the judgment of the circuit court granting the defendants' suppression motions.