**Kevin BENTLEY, Appellant–
Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A02–0508–CR–694.**

Court of Appeals of Indiana.

April 27, 2006.

Transfer Denied June 22, 2006.

---

9. As noted above, this is exactly what occurred here. See note 6, *supra.*

Robert D. King, Indianapolis, for Appellant.

Steve Carter, Attorney General of Indiana, J.T. Whitehead, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Appellant–Defendant Kevin Bentley ("Bentley") appeals his convictions for pos-

session of cocaine as a Class D felony [1] and possession of paraphernalia as a Class D felony.[2] We affirm.[3]

## Issue

Bentley raises one issue, which we restate as whether the trial court abused its discretion by admitting certain evidence at trial, in violation of the Fourth Amendment to the United States Constitution.

## Facts and Procedural History

On December 17, 2004, at approximately 4:30 p.m., Speedway Police Officers Michael Clupper ("Officer Clupper") and Todd Peirce ("Officer Peirce") responded to a report from dispatch that "suspicious people had been in the parking lot [at 6120 West 25th Street] for approximately 30 minutes." Tr. at 6. The parking lot in question was located near four businesses, including a Mexican grocery store, laundromat, and tobacco store. The report, which was made from an individual at the tobacco store, indicated that four suspicious individuals were sitting in a large, four-door, dark car, "believed to be a Crown Victoria" or an Oldsmobile. Id. at 33. Officer Clupper was familiar with the Mexican grocery store because, in a timeframe of less than one year, it had been robbed approximately six times and he had personally "taken three of those reports." Id. at 9. In addition, eleven days prior to the incident in question, the tobacco store had been robbed and "there have been numerous thefts" in the area. Id. at 34.

When the officers arrived on scene, they saw a Crown Victoria, matching the dispatch's description, containing three black males, including Bentley. Officer Peirce immediately "went over and spoke to the person who [had] called in the initial complaint." Id. at 34. Meanwhile, Officer Clupper approached the vehicle and questioned the occupants regarding their presence in the parking lot. At this point, Officer Clupper wanted to determine why the individuals were sitting in the parking lot. At the suppression hearing, he testified: "if they [had] said they were in there doing their laundry, fine, we would have gotten in our cars and drove away."[4] Id. at 10. However, upon being questioned about their reason for remaining in the parking lot, one of the passengers immediately turned and looked away from Officer Clupper. Officer Clupper considered this movement to be strange and it piqued his "interest even more that something might be wrong there." Id. at 11. Eventually, the driver gave a reason for being in the parking lot, which had nothing to do with the neighboring businesses. The reason, however, did not seem plausible to the officer.

Faced with what he considered to be an implausible story, Officer Clupper requested identification from all three males. The passenger occupying the right-rear seat continued to ignore the officer. At this time, Officer Peirce approached and asked the individuals to keep their hands visible. Officer Peirce asked the defiant passenger to put his hands "up on the seat." Id. at 54. The passenger kept placing his hands "down next to his legs, sort of tucked them

---

1. Ind.Code § 35–48–4–6.

2. Ind.Code § 35–48–4–8.3.

3. We heard oral argument in this case on April 13, 2006, at North Harrison High School in Ramsey, Indiana. We thank counsel for their advocacy and extend our appreciation to the members of the Harrison–Crawford Bar Association and to North Harrison High School for hosting the event.

4. See, e.g., Kelley v. State, 825 N.E.2d 420, 426–27 (Ind.Ct.App.2005) (noting that the court of appeals may review the uncontradicted evidence presented at the suppression hearing, in addition to the evidence adduced at trial).

in where [the officer] couldn't see what he was doing." *Id.* At one point, Officer Peirce saw the passenger either stuff something in the seat—where the back rest meets the seat cushion—or grab something and put it underneath his leg.

For safety purposes, the officers ordered everyone out of the car, including Bentley and the driver even though they had complied with the officers' requests. As Bentley exited the car, Officer Peirce saw him "take a crack pipe and stuff it— try to stuff it in the same place where the seats come together." *Id.* at 55. However, once the car was empty, the officers could see the crack pipe on the back seat, which they recognized from their training and experience. Officer Clupper described the crack pipe as a glass tube, which was burnt on the ends, with a metal screening on one end. This crack pipe contained a small-piece of off-white colored substance, which was later identified as .0075 grams of crack cocaine.

Officer Clupper put Bentley in handcuffs and placed him under arrest. A search incident to arrest revealed another crack pipe inside Bentley's shirt pocket. This pipe, too, "was a glass tube burnt on the end with a metal screening in the end of it." *Id.* at 50.

As a result of this incident, on or about December 18, 2004, the State charged Bentley with: (1) possession of cocaine as a Class D felony; (2) possession of paraphernalia as a Class A misdemeanor; and (3) possession of paraphernalia as a Class D felony.[5] On April 25, 2005, after conducting a hearing, the trial court denied Bentley's motion to suppress evidence seized during the encounter with Officers Clupper and Peirce. On June 13, 2005 and June 20, 2005, the trial court conducted a bench trial, at the conclusion of which, it found Bentley guilty of possessing cocaine as a Class D felony and possessing paraphernalia as a Class D felony. The trial court sentenced Bentley to the Indiana Department of Correction for two terms of three-hundred-and-sixty-five days, to be served concurrently.

**Discussion and Decision**

*I.  Standard of Review*

On appeal, Bentley argues that the trial court erred when it denied his motion to suppress evidence. However, because Bentley did not seek an interlocutory appeal after the denial of his motion to suppress, the issue presented is more appropriately framed as whether the trial court abused its discretion by admitting the evidence at trial. *Washington v. State,* 784 N.E.2d 584, 586–87 (Ind.Ct.App.2003); *but see Sellmer v. State,* 842 N.E.2d 358, 365 (Ind.2006) (reviewing the trial court's denial of the defendant's motion to suppress after trial). A trial court has broad discretion in ruling on the admissibility of evidence. *Bradshaw v. State,* 759 N.E.2d 271, 273 (Ind.Ct.App.2001). Accordingly, we will reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion. *Id.* An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Washington,* 784 N.E.2d at 586.

*II.  Analysis*

Bentley contends that the evidence seized during his encounter with Officers Clupper and Peirce is inadmissible under the Fourth Amendment to the United States Constitution. In particular, he maintains that "there was no reasonable and articulable suspicion for his detention by [Officer Clupper] and consequently all

---

5. The enhanced possession of paraphernalia charge was based upon Bentley's prior con- viction for possessing paraphernalia on October 26, 2001.

evidence seized as a result must be suppressed pursuant to the fruit of the poisonous tree doctrine." Appellant's Br. at 5. Before we address this argument, it is important to clarify that Bentley does not dispute that the officers had probable cause to effectuate his arrest after they had discovered the crack pipe in the vehicle. Nor does he contest the seizure of the crack pipe from his person during the search incident to the arrest or the seizure of the crack pipe from the vehicle, which was in plain view after the evacuation. Instead, his sole contention of error concerns the constitutionality of the initial detention. We now address this narrow claim of error.

■ The Fourth Amendment to the United States Constitution provides all citizens with "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ...." U.S. CONST. amend. IV; *see also Black v. State,* 810 N.E.2d 713, 715 (Ind.2004). The Fourth Amendment's protection against unreasonable search and seizure has been extended to the states through the Fourteenth Amendment. *See Berry v. State,* 704 N.E.2d 462, 464–65 (Ind.1998). The protection against unreasonable seizures includes seizure of the person. *California v. Hodari D.,* 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (citation omitted). However, not all police-citizen encounters implicate the Fourth Amendment. *See, e.g., Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude a 'seizure' has occurred."); *see also Molino v. State,* 546 N.E.2d 1216, 1218 (Ind.1989). A seizure does not occur, for example, simply because a police officer approaches a person, asks questions, or requests identification. *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *see also Sellmer v. State,* 842 N.E.2d 358, 360 (Ind.2006) (recognizing that a person is not seized within the meaning of the Fourth Amendment when police officers merely approach an individual and ask if the individual is willing to answer questions).

■ Instead, a person is seized for Fourth Amendment purposes when, considering all the surrounding circumstances, the police conduct "would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); *see also INS v. Delgado,* 466 U.S. 210, 216–17, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) ("Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment.").

Applying a version of the U.S. Supreme Court's test, this Court has determined that not "every street encounter between a citizen and the police" is a seizure. *Overstreet v. State,* 724 N.E.2d 661, 664 (Ind.Ct. App.2000), *reh'g denied, trans. denied.* In *Overstreet,* a police officer observed the defendant look into a mailbox, close the mailbox, and then hurriedly walk to a parked car and drive away. *Id.* at 662. The defendant, next, drove to a gas station, stopped his vehicle, and then exited the vehicle to pump air into one of his automobile tires. *Id.* at 662–63. At the gas station, the police officer pulled behind the defendant's car. *Id.* at 663. Without activating his flashing lights, the officer exited his vehicle, walked up to the defen-

dant, and asked him what he had been doing at the mailbox and for his identification. *Id.* The defendant volunteered that his license was suspended. *Id.* The *Overstreet* Court reasoned that the encounter did not implicate the Fourth Amendment because the police officer made a casual and brief inquiry of the defendant without arresting or stopping the defendant. *Id.* at 663–64. Put another way, the defendant made no showing that the officer intruded upon his liberty to the extent that he did not feel free to leave. *Id.* at 664.

Similarly, a number of other jurisdictions have held that there is no "seizure of persons" when an officer walks up to a person seated in a parked vehicle in a public place and asks a question of that person. *See, e.g., State v. Carlson,* 762 N.E.2d 121, 128 (Ind.Ct.App.2002) (citing *Latta v. Keryte,* 118 F.3d 693, 699 (10th Cir.1997) (holding that no seizure occurred where police officer approached parked vehicle and asked defendant to get out, but instead the defendant drove off); *United States v. Kim,* 25 F.3d 1426, 1430–31 (9th Cir.1994) (holding that there was no *Terry* stop where police officers came upon an already parked vehicle even though police car "partially blocked" the parked car), *cert. denied,* 513 U.S. 1030, 115 S.Ct. 607, 130 L.Ed.2d 517 (1994); *People v. Long,* 99 Ill.2d 219, 75 Ill.Dec. 693, 457 N.E.2d 1252, 1257 (1983) (holding that no seizure occurred where a police officer approached a parked vehicle and asked defendant a few questions); *State v. Marks,* 226 Kan. 704, 602 P.2d 1344, 1349 (1979) (holding that no seizure occurred where officer, responding to a police dispatch, approached parked vehicle and put questions to occupants); *People v. Taylor,* 454 Mich. 580, 564 N.W.2d 24, 28 (1997) (holding that officer made no seizure by merely approaching the vehicle in a public place and asking defendants if they were willing to answer some questions), *overruled on other*

*grounds by People v. Kazmierczak,* 461 Mich. 411, 605 N.W.2d 667, 674–75 (2000); *and State v. Glaesman,* 545 N.W.2d 178, 182 (N.D.1996) (holding that there was no seizure where police officer walked up to a parked pickup truck and then, when the driver opened door, police officer smelled alcohol)).

An encounter that begins as consensual might become a seizure, however, when a police officer *orders* a suspect to "freeze" or get out of the vehicle. *See* 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.4(a), at 434 (2004). The Fourth Amendment may also be implicated when police engage in activity, which one "would not expect if the encounter was between two private citizens—boxing the car in, approaching it on all sides by many officers, pointing a gun at the suspect and ordering him to place his hands on the steering wheel, or use of flashing lights as a show of authority." *Id.* at 434–35.

■ Here, the encounter between Officer Clupper and Bentley began as a consensual encounter. The record reveals that the officer approached the parked car and asked Bentley and the other occupants questions concerning their presence in the parking lot. When one passenger looked away from the officer, Officer Clupper asked for identification, a request which the same passenger ignored. This request did not convert the encounter into an investigatory stop. *See, e.g., Bostick,* 501 U.S. 429 at 434, 111 S.Ct. 2382, 115 L.Ed.2d 389.

■ The evidence further demonstrates that, when Officer Peirce approached the vehicle, he initially asked the occupants "to keep their hands where he could see them." Tr. at 60. He also asked the right-rear passenger to put his

hands "upon the seat." *Id.* This, too, was insufficient to convert the encounter into an investigatory stop requiring reasonable suspicion under Fourth Amendment jurisprudence. The record does not indicate, for instance, that the officers drew their weapons, spoke in an intimidating fashion, or otherwise restricted Bentley and the other individuals from leaving the area. *Cf. United States v. King,* 990 F.2d 1552 (10th Cir.1993) (finding a detention—as opposed to a consensual encounter—where the police officer ordered the defendant at gunpoint to place his hands on the steering wheel or be shot, as such conduct would communicate to the ordinary person that he was not free to decline the officer's request or otherwise terminate the encounter). Rather, the request for the passenger to keep his hands visible or up on the seat was largely to ensure officer safety.

■■■■ That said, the consensual encounter escalated into a seizure for purposes of the Fourth Amendment when the passenger placed his hands near his legs and the officers *ordered* all occupants out of the vehicle. *See, e.g., See* 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.4(a), at 434 (2004). The protection of the Fourth Amendment does "not ... guarantee against *all* ... seizures, but only against unreasonable ... seizures." *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court established the rule that a police officer may, without a warrant or probable cause, briefly detain a person for either investigatory purposes or a protective search ("frisk")—which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection—if,

based upon specific and articulable facts together with rational inferences from those facts, "official intrusion upon the constitutionally protected interests" of private citizens is reasonably warranted, and the officer has a reasonable suspicion that criminal activity "may be afoot." *Id.* at 21–22, 30, 88 S.Ct. 1868.

■■■■ The Supreme Court has recognized that "[t]he concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of legal rules." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citations omitted). Rather, in evaluating the legality of a *Terry* stop, we must consider "the totality of the circumstances—the whole picture." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Therefore, the reasonable-suspicion inquiry is fact-sensitive and must be determined on a case-by-case basis. *Lampkins v. State,* 682 N.E.2d 1268, 1271 (Ind.1997), *modified on reh'g on other grounds,* 685 N.E.2d 698. The reasonable suspicion requirement is satisfied where the facts known to the officer at the moment of the stop, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur. *Lyons v. State,* 735 N.E.2d 1179, 1183–1184 (Ind.Ct.App.2000), *trans. denied; see also Gipson v. State,* 459 N.E.2d 366, 368 (Ind.1984). Thus, reasonable suspicion entails something more than an inchoate and unparticularized suspicion or hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence. *Luster v. State,* 578 N.E.2d 740, 743 (Ind.Ct. App.1991). We review a trial court's determination regarding reasonable suspicion de novo. *Burkett v. State,* 736 N.E.2d 304, 306 (Ind.Ct.App.2000).

In the present case, Bentley asserts that the officers did not have reasonable suspicion that criminal activity was afoot when they detained him and, instead, "they should have released him and [the] other passengers when [Officer Clupper] asked the driver questions and obtained a response which revealed no criminal activity underfoot." Appellant's Br. at 5. Stated differently, Bentley maintains that the initial tip from the individual at the tobacco store, which he refers to as "anonymous," did not give the officers reasonable suspicion for the detention. Recently, in *Sellmer*, 842 N.E.2d. at 361, our Supreme Court held that for an anonymous tip to constitute the reasonable suspicion necessary for a valid investigatory stop, at least two conditions must be met. First, "significant aspects of the tip [must be] corroborated by the police." *Id.* (citing *Lampkins*, 682 N.E.2d at 1271). Such corroboration requires that an anonymous tip give the police something more than details regarding facts easily obtainable by the general public to verify its credibility. *Sellmer*, 842 N.E.2d. at 361. Second, the anonymous tip must demonstrate an intimate familiarity with the suspect's affairs and be able to predict future behavior. *See id.*

Here, it is unclear whether the report from dispatch emanated from an anonymous caller. Indeed, the evidence demonstrates that the tip came from the tobacco store and, further, that Officer Peirce spoke with the particular informant at the scene. However, even assuming that the report in question constituted an anonymous tip for purposes of *Sellmer*, we note that Bentley was not detained as a result of the initial report. Rather, the report from dispatch merely prompted the officers to investigate the alleged suspicious activity further. Bentley and the other occupants of the vehicle were detained during the investigation out of concern for officer safety.

In that vein, Bentley's detention is similar to the detention in *Terry*. There, a police officer observed three men who appeared to be casing a store for an armed robbery. 392 U.S. at 15, 88 S.Ct. 1868. The officer approached the men and, believing that they were armed, patted down their outer clothing, discovering that two of them were carrying guns, which led to concealed weapons charges. *Id.* Narrowly framing the issue as "whether it is always unreasonable for a policeman to seize a person and subject him to a limited search for weapons unless there is probable cause for an arrest," the Court held:

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons may be armed and presently dangerous ... he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30, 88 S.Ct. 1868.

Likewise, in the present case, the evidence demonstrates that when Officer Clupper questioned the occupants regarding their presence in the parking lot, he received what he considered to be an implausible response. What is more, the explanation had nothing to do with the neighboring businesses that share the commercial parking lot in question. In addition, during the initial questioning, one of the occupants looked away from Officer Clupper. When the officer requested identification, the same passenger continued to ignore the officer. These actions by the passenger, coupled with Officer Clupper's knowledge that the area businesses had experienced several recent rob-

beries and thefts, led the officer to suspect that criminal activity might be afoot.

Moreover, when Officer Peirce approached the vehicle and asked the occupants to keep their hands visible, the right-rear passenger placed his hands next to his legs so that the officer could not see what he was doing. At one point, Officer Peirce saw the passenger either stuff something in the seat cushion or grab something and place it underneath his leg. Out of concern for their safety, the officers ordered the right-rear passenger, as well as the other occupants out of the vehicle.[6] Under the totality of circumstances prior to the detention, the officers had reasonable suspicion to believe that criminal activity may be afoot and, therefore, the subsequent detention of the occupants, including Bentley, was proper.

For the foregoing reasons, we affirm Bentley's convictions for possession of cocaine as a Class D felony and possession of paraphernalia as a Class D felony.

Affirmed.

BAKER, J., and NAJAM, J., concur.

---

**6.** In the case at bar, Bentley's detention was incident to that of the right-rear passenger. Stated differently, the officers ordered Bentley out of the car to ensure their safety during the investigation of the other passenger. In *Pennsylvania v. Mimms*, 434 U.S. 106, 109–11, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the Supreme Court held that a police officer may order the driver of a lawfully stopped car to exit the car as a precautionary measure for the officer's safety. More recently the Court held that the *Mimms* rule applies to passengers as well as drivers. *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). Thus, when making a traffic stop, a police officer may now order passengers to get out of the car pending completion of the stop. *Id.* at 415, 117 S.Ct. 882; *see also Walls v. State*, 714 N.E.2d 1266, 1267 (Ind.Ct. App.1999) (noting that the underpinning of the *Mimms* and *Wilson* Courts' conclusion was that once a car was lawfully stopped by police, the additional intrusion on the liberty of the driver or passenger in ordering either of them to exit the car, is de minimis and is outweighed by considerations of the officer's safety), *reh'g denied, trans. denied.* Accordingly, the officers did not violate Bentley's constitutional rights by ordering him out of the vehicle.