956 N.E.2d 668 (2011)
S.G., Appellant-Respondent,
v.
STATE of Indiana, Appellee-Petitioner.
No. 49A05-1011-JV-736.
Court of Appeals of Indiana.
August 24, 2011.
*671 Mary E. Spears, Gilroy Kammen Hertzel & Moudy, Indianapolis, IN, Attorney for Appellant.
Gregory F. Zoeller, Attorney General of Indiana, J.T. Whitehead, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

OPINION
KIRSCH, Judge.
S.G. appeals his adjudication as a delinquent child for committing an act that would be considered Class D felony receiving stolen property[1] if committed by an *672 adult. On appeal he raises numerous issues, which we restate as follows:
I. Whether the juvenile court abused its discretion when, over S.G.'s objection, it admitted into evidence S.G.'s incriminating statements, which he alleges were involuntary and were obtained in violation of his constitutional right against self-incrimination;
II. Whether the evidence was sufficient for the juvenile court to adjudge S.G. a delinquent child for receiving stolen property; and
III. Whether the juvenile court abused its discretion when it imposed a restitution order in an amount S.G. alleges is greater than the victim's actual loss.
We affirm in part, reverse in part, and remand.[2]

FACTS AND PROCEDURAL HISTORY[3]
On February 19, 2010, Susan Sparks ("Sparks"), a teacher with the Indianapolis Public School System ("IPS"), was using the staff restroom of the Coleman Alternative Education Center ("Coleman") when her iPhone was stolen from her handbag, which she had left on the restroom counter. Sparks informed Coleman's principal, Linda Gagyi ("the Principal"), that her iPhone had been stolen. In turn, the Principal notified IPS Police Department Officer Steven Anthony Guynn, Jr. ("Officer Guynn"), who worked on school premises, about the stolen iPhone. During the fact-finding hearing, Officer Guynn described his duties at Coleman as follows: "[Responsible for] the safety and security of the students and staff. Also, dealing with any type of law enforcement issues that could arise from within the school or on the property from outside." Tr. at 4.
Officer Guynn's review of a school surveillance tape revealed that only one person had been in the restroom at the same time as Sparksa female student, T.C. Id. at 15. This prompted the Principal to speak with T.C. The next day, S.G. appeared on the "radar" as someone who might have involvement in the disappearance of Sparks's iPhone.[4]Appellant's Br. at 3.
At the Principal's request, Officer Guynn found S.G. and directed him to come to the Principal's office. The Principal and Officer Guynn sat with S.G. during a meeting in the Principal's office (the "meeting"), but only the Principal asked S.G. questions about the stolen cell phone. Prior to being questioned, S.G. was not *673 given Miranda warnings nor provided with an opportunity to speak with his parent or guardian. In response to the Principal's question, S.G. stated that T.C. had given him the cell phone and that he got rid of it after he learned from other students that it had been stolen from Sparks. Tr. at 10-21. Based on these statements, the Principal suspended him. Tr. at 17. The State filed a petition of delinquency on May 27, 2010, alleging that S.G. was a delinquent child because he had committed receiving stolen property, a Class D felony if committed by an adult.
During the fact-finding hearing, the State asked Officer Guynn and the Principal what S.G. had told them during the meeting about Sparks's missing cell phone. Tr. at 5, 16. Defense counsel objected to the State's line of questioning, contending that S.G.'s statements were inadmissible because they were made during a custodial interrogation, prior to which S.G. had not been informed of his rights under Miranda nor given an opportunity to consult with his parent or guardian. Id. at 9. Over defense counsel's continuing objection, the juvenile court allowed Officer Guynn and the Principal to testify regarding incriminating statements S.G. had made concerning his having possessed and disposed of the stolen cell phone. Id. at 9-10, 16.
Regarding her restitution claim, Sparks described her iPhone as being a "32 gig" when her iPhone "was a 16." Id. at 33. Additionally, Sparks replaced her stolen iPhone 3G with an iPhone 4Ga newer model. When Sparks was questioned as to whether the replacement iPhone was comparable to the stolen iPhone, she answered, "It's comparable to the phone that I had when I bought that phone. When I bought the 3G it was like the best thing they had to offer." Id. at 26. During cross-examination, and in response to the State's objection on relevance grounds, the juvenile court responded by noting, "She justtestified as to what she did.... She got a better phone." Id. at 33-34.
At the conclusion of the hearing, the juvenile court issued a true finding that S.G. was a delinquent child because he had knowingly received, possessed, or disposed of Sparks's stolen cell phone. See Ind. Code § 35-43-4-2(b). In addition and without inquiring into S.G.'s ability to pay, the juvenile court ordered as a condition of probation that S.G. pay restitution for the cell phone in the amount of $501.00, "authorize[d S.G.] to participate in the restitution work program," and set April 1, 2011 as the "end date" of probation. Tr. at 43-44. The juvenile court also instructed S.G.'s parents to "do whatever is necessary to ensure that [S.G.] completes these probation programs, which is really the restitution work program." Id. at 44. S.G. now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. Admission of Incriminating Statements
S.G. contends that the juvenile court abused its discretion by admitting into evidence, over his continuing objection, the incriminating statements he made during the meeting with the Principal and Officer Guynn. On appeal, he argues that these statements were obtained in violation of the Fifth Amendment to the United States Constitution because he was subjected to a custodial interrogation without being advised of his rights under Miranda[5] and without waiving his rights under Indiana Code section 31-32-5-1 (the *674 "juvenile waiver statute").[6] Additionally, S.G. contends that his statements were involuntarily made in violation of the Fifth Amendment to the United States Constitution and Article I, section 14 of the Indiana Constitution.[7]
A trial court is afforded broad discretion in ruling on the admissibility of evidence, and we will reverse such a ruling only upon a showing of an abuse of discretion. Bentley v. State, 846 N.E.2d 300, 304 (Ind.Ct.App.2006), trans. denied. An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. Id. In making this determination, this court does not reweigh evidence and considers conflicting evidence in a light most favorable to the trial court's ruling. Cole v. State, 878 N.E.2d 882, 885 (Ind.Ct.App. 2007). Regarding the "abuse of discretion" standard generally, our Supreme Court has observed, "to the extent a ruling is based on an error of law or is not supported by the evidence it is reversible, and the trial court has no discretion to reach the wrong result." Pruitt v. State, 834 N.E.2d 90, 104 (Ind.2005).
"A juvenile charged with delinquency is entitled to have the court apply those common law jurisprudential principles [that] experience and reason have shown are necessary to give the accused the essence of a fair trial." In re K.G., 808 N.E.2d 631, 635 (Ind.2004) (citing In re Gault, 387 U.S. 1, 30, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)). "Without question, these include ... the constitutional privilege against self-incrimination...." Id. "In protection of the right against self-incrimination, the United States Supreme Court's opinion in Miranda v. Arizona, established that `the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" P.M. v. State, 861 N.E.2d 710, 713 (Ind.Ct.App.2007). Such procedural safeguards include an advisement to the accused that he has the right to remain silent and that anything he says can be used against him. Id.
As this court recently reiterated, "[t]he special status accorded juveniles in other areas of the law is fully applicable in the area of criminal procedure." S.D. v. State, 937 N.E.2d 425, 429 (Ind.Ct.App. 2010), trans. denied (2011). "To give effect to that status in the context of waiving intricate, important, and long established Fifth ... Amendment rights, we require that a juvenile be afforded a meaningful opportunity to consult with a parent or guardian before the solicitation of any statement." Id. That is, in cases where a *675 juvenile is subject to custodial interrogation, such child must be read his rights under Miranda, and the State must obtain the waiver of such rights pursuant to the juvenile waiver statute.
Both parties concede that S.G. was neither read Miranda rights nor given the opportunity to have a meaningful consultation with a parent or guardian. As a general rule, however, Miranda warnings and the juvenile waiver statute attach only where a subject is both in custody and subject to interrogation. See S.D., 937 N.E.2d at 430 (evidence was clear that S.D. was interrogated by police officer; issue was whether he was in custody); P.M., 861 N.E.2d at 713 (State conceded that P.M. was in custody; issue was whether he was interrogated). Therefore, the threshold questions are whether S.G. was in custody, and if so, whether the questioning by the Principal constituted interrogation as recognized under the federal and state constitutions.

A. Custodial Interrogation
S.G. contends he was in custody because no reasonable juvenile in S.G.'s situation would have felt free to leave when being questioned under the facts of this case. S.G. maintains that Officer Guynn took S.G. to the Principal's office where, in the presence of Officer Guynn, the Principal interrogated him about the theft of Sparks's cell phone. Appellant's Br. at 7. The State maintains that Officer Guynn asked S.G. to come to the Principal's office, but that S.G. was in no other manner detained, restrained, or threatened by any law enforcement agent. The State contends that, if S.G. did not feel free to leave, it was not because Officer Guynn was present. Instead, it was because S.G. was talking to the Principal in her office; this was like "any question and answer session between any student and any school official at any school anywhere." Appellee's Br. at 5. As such, the State argues that this was not a custodial interrogation for the purpose of triggering either the requirements of Miranda or the juvenile waiver statute.
The purpose of Miranda is to dispel the inherently coercive effect of police custody and interrogation. Miranda, 384 U.S. at 467, 86 S.Ct. 1602. "[T]he special procedural safeguards outlined in Miranda are not required where a suspect is simply taken into custody, but rather where a subject in custody is subjected to interrogation." Rhode Island v. Innis, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). "Interrogation has been defined as a process of questioning by law enforcement officials which lends itself to obtaining incriminating statements." S.D., 937 N.E.2d at 430. "Under Miranda, `interrogation' includes express questioning and words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect." White v. State, 772 N.E.2d 408, 412 (Ind.2002) (citing Innis, 446 U.S. at 301, 100 S.Ct. 1682). The United States Supreme Court has held that the safeguards outlined in Miranda also apply to the functional equivalent of interrogation by the police. Innis, 446 U.S. at 301-02, 100 S.Ct. 1682; Robey v. State, 555 N.E.2d 145, 148 (Ind.1990).
Whether a person was in custody depends upon objective circumstances, not upon the subjective views of the interrogating officers or the subject being questioned. Gauvin v. State, 878 N.E.2d 515, 520 (Ind.Ct.App.2007), trans. denied. For an interrogation to be custodial in nature, one does not necessarily have to be under arrest. S.D., 937 N.E.2d at 430 (citing C.L.M. v. State, 874 N.E.2d 386, 390 (Ind.Ct.App.2007)). To be custodial in the non-arrest context, the interrogation *676 must commence after the person's freedom of action has been deprived in any significant way. Id.; see also Luna v. State, 788 N.E.2d 832, 833 (Ind.2003) ("When determining whether a person was in custody or deprived of his freedom, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (internal quotations omitted)). This is determined by examining whether a reasonable person in similar circumstances would believe he is not free to leave. Luna, 788 N.E.2d at 833. "It is well established in the caselaw defining `interrogation' and `custody' that the two cannot exist without the presence of a law enforcement officer." Elizabeth A. Brandenburg, School Bullies-They Aren't Just Students: Examining School Interrogations and the Miranda Warning, 59 Mercer L.Rev. 731, 734 (2008) (citing Miranda, 384 U.S. at 478, 86 S.Ct. 1602).
The analysis of whether a juvenile is in custody for purposes of Miranda, while sufficiently complicated, becomes all the more so when, as here, a child is questioned at his or her school and in the presence of a police officer.
A school with a traditionally tutelary principal and one with a taser firing officer stand at opposite ends of a spectrum with respect to the degree and nature of force to which students may be subjected. Miranda claims at either end are fairly easy to address. A principal acting alone and without invoking or outwardly benefiting from the authority of any law enforcement officer may question a student without complying with Miranda's requirements. A student's answers to such questions will be admissible at subsequent juvenile or criminal proceedings. On the other hand, a police officer who acts in a traditional law enforcement modefor example arranging for a student to be removed from class, handcuffed, and placed in a closed office alone with the officermust advise the student of her rights before questioning the student. If the officer fails to do so, any statements made by the student will not be admissible in juvenile or criminal proceedings. The challenges for courts will come from the array of cases that fall between these two extremes. The modern alignment between educational and law enforcement authorities requires courts to determine whether and when a principal's questioning [is] subject to Miranda and how an officer's part-time assignment at the front of a crowded classroom should affect the analysis of the officer's subsequent interrogation of a lone student in a closed office.
Paul Holland, Schooling Miranda: Policing Interrogation in the Twenty-First Century Schoolhouse, 52 Loy. L.Rev. 39, 41 (2006). We proceed, recognizing that the facts before us come from that array of cases that Paul Holland describes as "fall[ing] between the two extremes." Id.
The parties cite to three Indiana cases in which our court has specifically addressed the issue of whether a student was in custody when questioned at his or her school; State v. C.D., 947 N.E.2d 1018 (Ind.Ct.App.2011); G.J. v. State, 716 N.E.2d 475 (Ind.Ct.App.1999); S.A. v. State, 654 N.E.2d 791 (Ind.Ct.App.1995), trans. denied, disapproved of on other grounds by Alvey v. State, 897 N.E.2d 515 (Ind.Ct.App.2008).
In S.A., after receiving a tip that a missing school book could be discovered in S.A.'s bookbag, a school police officer removed S.A. from his regularly scheduled class and escorted him to the vice-principal's office. The vice-principal asked S.A. whether he had any school property in his possession. 654 N.E.2d at 796. S.A. repeatedly *677 said that he did not. Upon being asked by the vice-principal to open his bookbag, S.A. admitted to having possession of the book, but said that he found it. The vice-principal then called S.A.'s father, who arrived at the school shortly thereafter. Id. S.A.'s father continued to question S.A. in the vice-principal's presence, and eventually, S.A. admitted to stealing the book from the guidance office and using it to gain access to student lockers and steal jackets. Id. at 796-97.
On appeal of the denial of S.A.'s motion to suppress, our court found that admission at the fact-finding hearing of S.A.'s incriminating statements did not violate his right against self-incrimination because there was no coercive atmosphere to protect against; the questioning took place in the school building, by the vice-principal, and a major portion of it occurred in the presence of the student's father. Id. at 797. Therefore, S.A. was not in police custody nor was he interrogated by a police officer and the Miranda safeguards did not attach. Id.
In G.J., the police told school officials they had heard that G.J. had brought marijuana to school. 716 N.E.2d at 476. On that same day, G.J. was brought to the dean's office. The facts do not reveal whether a police officer escorted G.J., and if so, whether the officer remained for the questioning of G.J. The dean asked G.J. if he had marijuana. Id. at 477. In response, G.J. pulled a vial of marijuana from his pants pocket. On appeal, G.J. argued that the dean should not have questioned him without providing him with a meaningful opportunity to consult with his parents. Id. We disagreed, determining that G.J. was not subjected to custodial interrogation when the dean questioned him. G.J. was questioned in his school by a school official. Consequently, the Miranda safeguards and the safeguards set forth in Indiana Code section 31-32-5-1 (1997) did not apply. Id.
In C.D., C.D., a student at Mooresville High School, was brought to the principal's office after a teacher noticed he seemed "under the influence of some substance." 947 N.E.2d at 1020. The principal, who had interacted with C.D. on prior occasions and noticed that his speech and mannerisms were slower than normal, asked for the assistance of Officer Chad Richhart ("Richhart"). Richhart, who was both a security officer employed by the school system and an officer of the Mooresville Police Department ("MPD"), was wearing his MPD uniform. The principal asked Richhart, a "drug recognition evaluator," to determine what substance C.D. might have taken. Id. The examination took place in the principal's office with only the student, the principal, and the officer being present. Once completed, Richhart told the principal that he thought C.D. "was under the influence of marijuana and had smoked it that day." Id. C.D. stated that he had not smoked marijuana that day but had smoked some the previous night. The principal told C.D. he would be suspended from school. The principal then searched C.D.'s backpack and discovered two pills that were identified as Adderall, a controlled substance. The principal gave the pills to Richhart and then contacted C.D.'s mother. Thereafter, the State filed a delinquency petition against C.D.
Prior to the fact-finding hearing, C.D. filed a motion to suppress and, following a hearing on the matter, the trial court issued an order, ruling inadmissible all evidence "obtained from the child prior to the child and parent having an opportunity for meaningful consultation outside the presence of school officials and the police...." Id. at 1021. We reversed, finding:
[T]his case resembles that of G.J. The environment in which C.D. was questioned *678 was no more coercive than in G.J., as both were questioned at school. C.D. was not free to leave [the principal's] office, but he was detained by [the principal] for an educational purpose, which was to keep possibly intoxicated students out of the classroom. Furthermore, C.D. admitted to drug use without being directly questioned on that point by Richhart or [the principal]. After the examination, [the principal] told C.D. he would be suspended from school, which further demonstrates that C.D.'s examination was intended to carry out an educational function or school purpose, not to further a criminal investigation.
We note that in C.D.'s case, unlike in G.J., C.D. was examined by a school security officer in police uniform rather than a school administrator. Under the circumstances of this case, we conclude that this difference is not significant. Richhart was not independently investigating the matter. Instead, Richhart examined C.D. at [the principal's] request and in [the principal's] presence. Furthermore, after the examination was complete, [the principal] did not immediately ask Richhart to take C.D. into custody but instead advised C.D. that he would be suspended. This evidence indicates that Richhart was acting to fulfill an educational purpose. Therefore, the fact that Richhart, rather than [the principal], examined and questioned C.D. did not transform the examination into a custodial interrogation.
Consequently, we conclude that C.D. was not undergoing custodial interrogation when he answered Richhart's questions and made an incriminating admission, and the Miranda warnings and safeguards in Indiana Code section 31-32-5-1 (1997) are inapplicable here. Thus, C.D. was not deprived of his right to meaningful consultation with his parents when Richhart examined him.
C.D., 947 N.E.2d at 1022-23.
S.G. also cites to S.D., noting the circumstances of custody that make the interrogation of a juvenile into a custodial interrogation. In S.D., when there was no evidence that the juvenile went to the interview voluntarily, but instead, the evidence showed that the juvenile was interrogated at some length by a detective in a small room, these facts were sufficient to lead a reasonable person in the same situation to believe that he would not be "free to leave." Appellant's Br. at 8-9 (citing S.D., 937 N.E.2d at 430-31). S.G. fails to note, however, that S.D. initially denied the allegations and only confessed after he was questioned by a police detective for one-and-a-half hours, but had been kept in the room for two-and-one-half hours. In reversing the trial court's denial of the motion to suppress the evidence, our court concluded that S.D. had been in custody and was not given the opportunity to have a meaningful consultation with his legal guardian and his statements were coerced. Although custody was discussed in S.D., it was not the dispositive issue. The detective, who read S.D. his rights under Miranda and had S.D. review and sign an advisement of rights, apparently also understood that S.D. was in custody. There, the coercion rested on the fact that, since the juvenile was in custody, his rights were violated when the State failed to comply with the juvenile waiver statute, i.e., failed to give S.D. the opportunity to have a meaningful consultation with his legal guardian in order to waive his rights.
S.G. also notes that other states have extended the concept of custody to school situations in which a school official, rather than a police officer, does the questioning, holding that the officer's pervasive presence can "significantly increase[ ] the likelihood *679 [that the juvenile] would produce an incriminating response to the principal's questioning." Appellant's Br. at 9 (citing In re K.D.L., 700 S.E.2d 766, 772 (N.C.Ct. App.2010)). As such, a juvenile questioned under those circumstances is therefore "in custody." Id. "Moreover, even when a private party such as a school initiates an investigation, the totality of the circumstances still can result in the kind of `coercive atmosphere' that gives rise to a custodial interrogation." Id.
We agree with S.G. that under certain circumstances a police officer's presence in conjunction with a school official's questioning may be significant enough to constitute the type of setting that we would characterize as custodial; however, we conclude that the facts of this case do not satisfy the requirements of a custodial interrogation.
Here, S.G. was a seventeen-year-old student who participated in a "metro expulsion" program when he came to the attention of the Principal as a person who might be involved in the theft of Sparks's cell phone. The Principal testified that, as a principal, it is her duty to "supervise all the staff, students, all the employees in the building, the maintenance of the building, supervise instruction, [and] discipline." Tr. at 14. The Principal contacted Officer Guynn, who worked on the school premises, and asked him to bring S.G. to her office. Thus, S.G. was brought to the Principal's office, at the Principal's request, not that of the police officer. There, S.G. was asked one question, whether he had Sparks's cellphone.[8]Tr. at 16. After hearing S.G.'s answer, the Principal suspended him from school and called S.G.'s parents, "told them about what happened that day and what the consequences could be." Tr. at 17.
Officer Guynn became involved in the case only at the Principal's behest. Although Officer Guynn was present during the meeting, he did not provide the questions, ask any questions, or in any other way conduct or participate in the meeting. There is no evidence that he directed the Principal's questioning or even that he knew what questions the Principal would ask or how she would conduct the meeting. Officer Guynn's presence was consistent with his stated duty of being responsible for the "safety and security of the students and staff," especially in the context of keeping order in a "metro expulsion" program. Tr. at 4.
There is no evidence that Officer Guynn's presence was threatening. He was not separately investigating who had taken Sparks's phone. When S.G. admitted to having had the phone and a search of the boys' restroom did not reveal the stolen phone, Officer Guynn did not take S.G. into custody. In fact, a delinquency petition was not filed against S.G. for two more months.
Finally, there was no evidence about the size of the meeting room, whether the meeting room door was open or closed, or how long the meeting lasted, and there were no questions to reveal that S.G. felt in any way coercively detained.
Recognizing that Officer Guynn did not question S.G. during the meeting, S.G. contends that, when the Principal asked him questions that involved "a law enforcement matter," the Principal was acting as Officer *680 Guynn's agent for purposes of obtaining incriminating statements concerning the theft of Sparks's cell phone. Tr. at 8. Additionally, S.G. contends that Officer Guynn intentionally refrained from asking S.G. any questions, saying, "this [method of investigation] is what we do[,]" because theft of property from a teacher is "a law enforcement matter." Id. at 8.
Police cannot avoid their duty under Miranda by attempting to have someone act as their agent in order to bypass the Miranda requirements. Sears v. State, 668 N.E.2d 662, 668 (Ind.1996), overruled on other grounds, Scisney v. State, 701 N.E.2d 847 (Ind.1998). Here, there is no evidence that the Principal was acting as Officer Guynn's agent. The Principal requested that Officer Guynn bring S.G. into her office. Prior to this call, Officer Guynn knew nothing of the stolen cell phone. Additionally, there is no evidence that Officer Guynn intended to conduct a separate investigation. The officer remained in the office and served only as a presence for security purposes. The Principal was the sole questioner and, once she had found out the answers, she suspended S.G. for his participation in the disappearance of Sparks's cell phone. The Principal did not serve as Officer Guynn's agent to question S.G. in connection with a law enforcement matter. S.G. was not subjected to custodial interrogation. Here, there was an absence of the crucial element of police coercion, the length of the interrogation was relatively short, the Principal's office was not described as a coercive atmosphere, and the defendant was seventeen years old. See Pruitt, 834 N.E.2d at 115 (setting forth factors to consider for voluntariness).
We recognize the potential for abuse whenever a police officer is present for the questioning of a student in regard to a matter that has the potential for both school disciplinary and criminal law consequences. We understand the important balance that must be maintained between preserving a juvenile's right against self-incrimination with a school's right to maintain discipline and safety. Under the facts of this case, we find that balance weighs toward a finding that S.G. was not subject to custodial interrogation.[9]

B. Voluntariness
S.G. also contends that his statements to the Principal were not voluntary under Article I, section 14 of the Indiana Constitution. Appellant's Br. at 12. At the fact-finding hearing, S.G. did not specifically object to the admission of his statements on the grounds that they were involuntary, and, accordingly, S.G. waived any argument that the introduction of his statement violated Article I, section 14 of the Indiana Constitution.
Waiver notwithstanding, the introduction of S.G.'s statement did not violate Article I, section 14. Like the Fifth Amendment, Article I, section 14 of the Indiana Constitution protects Indiana citizens against the introduction of compelled self-incriminating statements. In evaluating a claim that a statement was not voluntarily given, the trial court is to consider the totality of the circumstances, *681 including: "the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." Pruitt, 834 N.E.2d at 115. Here, as stated above, S.G.'s statement was not the product of a custodial interrogation, and there is no evidence of police coercion. The interrogation was short and conducted in a school setting by a school principal. Although Officer Guynn was present, he did not participate in any way in the questioning of S.G. Accordingly, the trial court did not err in admitting S.G.'s statement.

II. Sufficiency of Evidence
S.G. contends that the incriminating statements he made during the meeting provided insufficient evidence to prove, beyond a reasonable doubt, that he received stolen property as a Class D felony. See Ind.Code § 35-43-4-2(b). Specifically, he contends that the State failed to prove that he was in possession of a stolen phone, and that he "had `guilty knowledge that the [cell phone] had been stolen by [T.C.]'" Appellant's Br. at 20.
When reviewing a claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. Jones v. State, 783 N.E.2d 1132, 1139 (Ind.2003). We look only to the probative evidence supporting the verdict and the reasonable inferences that may be drawn from that evidence to determine whether a reasonable trier of fact could conclude that the defendant was guilty beyond a reasonable doubt. Id. If there is substantial evidence of probative value to support the conviction, it will not be set aside. Id.
The statute defining the crime of receiving stolen property provides: "A person who knowingly or intentionally receives, retains, or disposes of the property of another person that has been the subject of theft commits receiving stolen property, a Class D felony." Ind.Code § 35-43-4-2(b). In addition to proving the explicit elements of the crime, the State must also prove beyond a reasonable doubt that the person knew that the property was stolen. Fortson v. State, 919 N.E.2d 1136, 1139 (Ind.2010) (citing Gibson v. State, 643 N.E.2d 885, 887 (Ind.1994)); Ind.Code § 35-41-2-2(d) ("Unless the statute defining the offense provides otherwise, if a kind of culpability is required for commission of an offense, it is required with respect to every material element of the prohibited conduct."). The test of knowledge is not whether a reasonable person would have known that the property had been the subject of theft, but whether, from the circumstances surrounding the possession, the defendant himself knew that it had been the subject of theft. Vlietstra v. State, 800 N.E.2d 972, 976 n. 7 (Ind.Ct.App.2003) (citing Gibson, 643 N.E.2d at 888). "[K]nowledge that property is stolen may be inferred from the circumstances surrounding the possession." Fortson, 919 N.E.2d at 1139; Stone v. State, 555 N.E.2d 475, 477 (Ind.1990).
Sparks's cell phone was never found. S.G. maintains that without the iPhone, and in the absence of a description of the cell phone given by T.C. to S.G., there was no evidence or inference that could be drawn that the cell phone he was holding was in fact stolen because there was no evidence to show that it was the phone that belonged to Sparks. Additionally, S.G. asserts that the evidence was insufficient to prove that he had guilty knowledge that the cell phone in his possession was stolen. We disagree.
During the fact-finding hearing, Officer Guynn testified as follows:
When asked about the incident at that time, [S.G.] told [the Principal] that *682 [T.C.] handed him a cell phone after lunch, during that day, which would've been around 4:30, whatever, and as they walked around, [T.C.] told him, "Look, could you hold my cell phone for me?" And he said yeah. He stated that as they walked down the hallway, other students told him that [T.C.] had stolen the phone and he said that he got rid of it.... Originally he told me it was in the hallway. So he just threw it down the hallway.
Tr. at 10 (emphasis added). The Principal testified:
[S.G.] told me that he did not have the cell phone anymore, but that the other young lady handed it off to him.... That he knew it was Ms. Sparks' cell phone and so he didn't want to get in trouble with it so he left it in the boys' restroom down the hallway.
Id. at 16-17 (emphasis added). This evidence is sufficient for the juvenile court, as finder of fact, to determine that S.G. knew that the cell phone in his possession had been stolen from Sparks.
Nevertheless, S.G. contends that, because he had no knowledge that the cell phone was stolen when it was given to him by T.C., his later knowledge of the phone's stolen nature cannot support a conviction where he disposed of the phone only because he was panicked. "The `receiving stolen property' statute requires either knowing or intentional disposal of stolen property, so it must either have been his conscious objective to dispose of actually stolen property ... or he must have been aware of a high probability that he was doing so." Appellant's Br. at 21. S.G. maintains that "knowledge," is the gravamen of the offense. Id. As such, "successful proof of `disposal' of stolen property involves proof that the defendant sold that property through unconventional means or at an inordinately low price." Id. (citing Barnett v. State, 834 N.E.2d 169 (Ind.Ct. App.2005)). S.G. maintains that disposal of property in a panic "is not the type of case envisioned by the General Assembly, or our Supreme Court." Id. Again, we disagree.
Receiving stolen property can be proven by evidence that the suspect knowingly or intentionally received, retained or disposed of property that was the subject of theft. Ind.Code § 35-43-4-2(b). Here, once S.G. knew that he was in possession of a stolen cell phone and disposed of it, his knowing disposal of stolen property was sufficient to find he had committed the charged offense. As explained below, S.G.'s claim of panic is no defense.
Indiana Code section 35-43-4-2(b) criminalizes any action that a person might take after learning that property is stolen.[10] Not wanting to punish those who innocently possess property and only later learn of its stolen nature, the Indiana General Assembly enacted a defense for the offense of receiving stolen property. Indiana Code section 35-43-4-5(d) provides: "A person who receives, retains, or disposes of personal property that has been the subject of theft with the purpose of restoring it to the owner, does not commit a crime under this chapter." Ind.Code § 35-43-4-5(d). By enacting this statute, the legislature made clear its intent to recognize only one defense to a finding that a defendant knowingly disposed of stolen propertythat the actions taken by the accused were performed "with the purpose of restoring [the stolen property] to the owner." Id. (emphasis added). Assuming, *683 arguendo, that S.G. disposed of the stolen cell phone only because he was in a panic, that evidence would be insufficient to provide a defense to the charged offense. The record before us reveals that S.G.'s statements contained sufficient evidence for the juvenile court to adjudicate S.G. a delinquent child for committing an act that would be considered Class D felony receiving stolen property if committed by an adult.

III. Restitution
Pursuant to Indiana Code section 31-37-19-5, "a juvenile court may order the [delinquent] child to pay restitution if the victim provides reasonable evidence of the victim's loss, which the child may challenge at the dispositional hearing." An order of restitution is a matter within the trial court's discretion, and this court will reverse only upon a showing of an abuse of discretion. M.L. v. State, 838 N.E.2d 525, 528 (Ind.Ct.App.2005), trans. denied. An abuse of discretion occurs when the trial court's determination is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. Id.
The adult restitution statute, Indiana Code section 35-50-5-3, requires that a restitution order for property damages be "based on the actual cost of repair (or replacement if repair is inappropriate)." The adult statute is instructive when the juvenile statute is silent. M.L., 838 N.E.2d at 528-29. Evidence supporting a restitution order is sufficient "if it affords a reasonable basis for estimating loss and does not subject the trier of fact to mere speculation or conjecture." T.C. v. State, 839 N.E.2d 1222, 1227 (Ind.Ct. App.2005).
S.G. contends that the juvenile court abused its discretion in determining restitution should be paid to Sparks in the amount of $501.00. "`The purpose behind an order of restitution is to impress upon the criminal defendant the magnitude of the loss he has caused and to defray costs to the victim caused by the offense.'" Rich v. State, 890 N.E.2d 44, 50 (Ind.Ct. App.2008) (quoting Carswell v. State, 721 N.E.2d 1255, 1259 (Ind.Ct.App.1999)), trans. denied. "It is well settled that restitution must reflect actual loss incurred by a victim." Smith v. State, 471 N.E.2d 1245, 1248 (Ind.Ct.App.1984), trans. denied. "For crimes involving harm to property, a trial court `shall base its restitution order upon a consideration of ... property damages of the victim incurred as a result of the crime, based on the actual cost of repair (or replacement if repair is inappropriate).'" Rich, 890 N.E.2d at 50 (quoting Ind.Code § 35-50-5-3(a)(1)). The amount of actual loss is a factual matter which can be determined only upon presentation of evidence. Id.
S.G. contends that restitution in the amount of $501.00 was an abuse of discretion because Sparks replaced her iPhone 3G with an iPhone 4G. Sparks testified that she spent $399.00 for her iPhone 3G, "when it was the best thing [Apple] had to offer," and $29.99 for her original case. Tr. at 26, 35. Sparks also testified that the replacement phone and case cost about $450.00. Id. at 29. Sparks submitted a receipt for the replacement iPhone in the amount of $500.76; $399.00 for the iPhone 4G, $69.00 for an item called "APPIPHONE-RAE-USA," (which S.G. contends is a technology plan), and $32.76 in tax. State's Ex. 1. While the State does not address the issue of the reasonableness of the restitution order, its position, as reflected in the fact-finding hearing transcript, appears to be that restitution reflects Sparks's losses because she paid about the same amount for the iPhone 4G *684 as she had paid for her iPhone 3G. Tr. at 35.
Concerning restitution for property damage incurred as a result of a crime, the trial court's restitution order must be based on the actual cost or repair. I.C. § 35-50-5-3(a)(1); Shane v. State, 769 N.E.2d 1195, 1199 (Ind.Ct.App.2002). Restitution is not a means by which a victim may obtain better or more state of the art equipment. Sparks testified that the iPhone 4G was the same as the one she lost because, like the 3G, it was the best one Apple had when she was buying her phone. First, we note that in February 2010, the iPhone 4G had not yet been released for purchase.[11] S.G. was only able to buy that product because she delayed her purchase until July 2010. Tr. at 32. Second, we note that Sparks has cited to the wrong standard. Sparks was not entitled to replace the phone with the best on the market. She was only entitled to the actual replacement cost of the phone that was stolen.[12] Ind.Code § 35-50-5-3.
Noting that the amount of restitution is a question of fact to be resolved by the trier of fact, we reverse and remand with instructions that the juvenile court vacate the restitution order. If the State so desires, a new restitution hearing may be conducted for the juvenile court: (1) to determine Sparks's actual loss based upon evidence of the replacement cost of her iPhone 3G (valued as of the time it was stolen) and its case, see Smith, 471 N.E.2d at 1249 (finding no basis for restitution amount, case was remanded for determination based upon evidence); and (2) make inquiries regarding S.G.'s ability to pay a revised restitution amount prior to making that amount a condition of probation, see M.L., 838 N.E.2d at 527 (equal protection and fundamental fairness concerns require juvenile court to inquire into juvenile's ability to pay before court can order restitution as condition of probation).
Affirmed in part, reversed in part, and remanded with instructions.
VAIDIK, J., and MATHIAS, J., concur.
NOTES
[1] See Ind.Code § 35-43-4-2(b).
[2] On appeal, S.G. also contends that the juvenile court abused its discretion when it included restitution as a condition of probation without first determining S.G.'s ability to pay. Because we vacate the restitution order, we do not address that issue on appeal. However, we instruct the juvenile court on remand to make inquiries regarding S.G.'s ability to pay restitution prior to making it a condition of probation. See M.L. v. State, 838 N.E.2d 525, 527 (Ind.Ct.App.2005) (equal protection and fundamental fairness concerns require juvenile court to inquire into juvenile's ability to pay before court can order restitution as condition of probation).
[3] Oral argument was heard on this case in Indianapolis on June 29, 2011. We commend counsel for the quality of their written and oral advocacy.
[4] At the fact-finding hearing, the State attempted to elicit testimony from Officer Guynn and the Principal regarding how each had learned of S.G.'s possible involvement, however, defense counsel objected to the witnesses' responses as hearsay. Tr. at 5, 16. The juvenile court sustained those objections, and, while not admitting the statements for the truth of the matter, allowed the testimony for the limited purpose of determining why S.G. was brought in for questioning. Id. at 5, 16.
[5] Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[6] The relevant provisions of Indiana Code section 31-32-5-1 provide that any state or federal constitutional rights guaranteed to a child may be waived only:

(2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:
(A) that person knowingly and voluntarily waives the right;
(B) that person has no interest adverse to the child;
(C) meaningful consultation has occurred between that person and the child; and
(D) the child knowingly and voluntarily joins with the waiver.
[7] The State must prove by a preponderance of the evidence that the defendant's confession was voluntary under the Fifth Amendment of the United States Constitution. Clark v. State, 808 N.E.2d 1183, 1191 (Ind.2004). Under Article I, section 14 of the Indiana Constitution, however, voluntariness must be proven beyond a reasonable doubt. Wright v. State, 916 N.E.2d 269, 277 (Ind.Ct.App.2009), trans. denied (2010) (citing Clark, 808 N.E.2d at 1191).
[8] "I called [S.G.] into my office and asked him if he had Mrs. Sparks'[s] cell phone." Id. at 16. "[S.G.] told me that he did not have the cell phone anymore, but that the other young lady handed it off to him.... That he fell [sic] bad.... That he knew it was Ms. Sparks'[s] cell phone and so he didn't want to get in trouble with it so he left it in the boys' restroom." Id. at 16-17.
[9] In J.D.B. v. North Carolina, ___ U.S. ___, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011), the United States Supreme Court, while noting that age may not be a determinative or even a significant factor, held that a child's age also is a proper consideration in the Miranda custody analysis, so long as the child's age was known to the officer at the time of police questioning or would have been apparent to a reasonable officer. Here, the Principal and Officer Guynn knew that S.G. was in high school. Furthermore, his school records reflected that he was almost eighteen years old. Under the facts of this case, we find that S.G.'s age is not a significant factor in our custody determination.
[10] As noted above, Indiana Code section 35-43-4-2(b) section provides, "A person who knowingly or intentionally receives, retains, or disposes of the property of another person that has been the subject of theft commits receiving stolen property, a Class D felony."
[11] The iPhone 4G was not available for purchase until June 2010. http://technology.gather.com/viewArticle.action?articleId=XXXXXXXXXXXXXXXavi (last visited July 26, 2011).
[12] Because the iPhone 4G was not yet on the market when Sparks's phone was stolen, and would not be available for purchase for about four more months, we assume that Sparks could have replaced her cell phone with an iPhone 3G.