Riley, Judge.
STATEMENT OF THE CASE
[1] Appellant-Respondent, D.Z., appeals the juvenile court's delinquency adjudication for an act that would have been a Class B misdemeanor if committed by an adult.
[2] We reverse.
ISSUE
[3] D.Z. presents us with four issues on appeal, one of which we find dispositive and which we restate as: Whether the juvenile court abused its discretion by admitting D.Z.'s incriminating statements to a school official, who was working in cooperation with law enforcement.
FACTS AND PROCEDURAL HISTORY
[4] Around February or March 2017, graffiti of a sexual nature began to appear on the walls of the boys' restrooms at Brownsburg High School, in Indiana. Assistant principal Demetrius Dowler (Dowler) commenced an investigation to find the person responsible and reviewed surveillance video footage of the hallways where the related bathrooms are located. On March 15, 2017, Dowler reported "mischief of vandalism and graffiti" on the bathroom walls and stalls to Officer Nathan Flynn (Officer Flynn) and requested his assistance with the ongoing investigation. (Tr. p. 17). Officer Flynn is a police officer with the Brownsburg community schools and is employed "by the school for law enforcement duties." (Tr. p. 17). In that capacity, he is "called to investigate allegations of misconduct within the school." (Tr. p. 17). Together, Officer Flynn and Dowler started a methodical search of the boys' restrooms *598 and narrowed down time frames when graffiti was located. They used these time frames to review surveillance footage to determine who was in the restrooms during the time when new graffiti appeared. After reviewing the surveillance video, both Officer Flynn and Dowler pinpointed seventeen-year-old D.Z. as a suspect.
[5] On March 17, 2017, Dowler called D.Z. down to his office for a "discussion" right before the "[e]nd of the day." (Tr. pp. 55, 56). Dowler questioned D.Z. in his office with the door closed. D.Z. was not offered the opportunity to speak to a parent or guardian prior to the commencement of the interview, nor was his parent or guardian contacted prior to D.Z.'s removal from class. During this conversation, D.Z. was not advised that "he had a right not to answer questions that might incriminate himself." (Tr. p. 56). Dowler informed D.Z. that he had been "tracking some restroom graffiti" and explained the investigation to him. (Tr. p. 61). Dowler clarified that he "knew that [D.Z.] was the one that was responsible for graffiti on the wall." (Tr. p. 61). D.Z. responded that he didn't know why he did it. After D.Z. showed remorse, Dowler told him that "what [he] did was wrong and so we're going to have to definitely take care of it." (Tr. p. 62). Dowler suspended D.Z. for five days. After his discussion with D.Z., Dowler left the room and informed Officer Flynn that D.Z. had "admitted to the messages/writing on the wall." (Tr. p. 43). Dowler then contacted D.Z.'s father. Meanwhile, Officer Flynn, in full police uniform, entered Dowler's office and spoke to D.Z. The officer did not advise D.Z. of his constitutional rights, contact D.Z.'s father, or record the interview. Eventually, at the end of the interview, Officer Flynn "let [D.Z.] know he was being charged with a crime." (Tr. p. 44).
[6] On April 18, 2017, the State filed a Petition Alleging Delinquency, claiming that D.Z. had committed acts that would be an offense if committed by an adult, namely, criminal mischief and harassment. On July 17, 2017, the juvenile court conducted a fact-finding hearing. During the hearing, D.Z. moved to suppress, and the State agreed to suppress, the testimony of Officer Flynn regarding incriminating statements made to him by D.Z. as D.Z. had not been informed of his Miranda[1] rights prior to uttering the statements. The juvenile court granted the motion. At the conclusion of the fact-finding hearing, the juvenile court entered a true finding on the allegation of criminal mischief, as a Class B misdemeanor if committed by an adult, but found that the State had not established the harassment allegation beyond a reasonable doubt. That same day, the juvenile court placed D.Z. on probation for four months.
[7] D.Z. now appeals. Additional facts will be provided when necessary.
DISCUSSION AND DECISION
I. Standard of Review
[8] D.Z. contends that the juvenile court abused its discretion by admitting into evidence, over his objection, the incriminating statements he made during the meeting with the assistant principal. He maintains that these statements were obtained in violation of the Fifth Amendment to the United States Constitution because he was subjected to a custodial interrogation without being advised of his rights under Miranda .
[9] A trial court is afforded broad discretion in ruling on the admissibility of evidence, and we will reverse such a ruling only upon a showing of an abuse of discretion.
*599 Bentley v. State , 846 N.E.2d 300, 304 (Ind. Ct. App. 2006), trans. denied . An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. Id. In making this decision, this court does not reweigh evidence and considers conflicting evidence in a light most favorable to the trial court's ruling. Cole v. State , 878 N.E.2d 882, 885 (Ind. Ct. App. 2007). Regarding the "abuse of discretion" standard generally, our supreme court has observed, "to the extent a ruling is based on an error of law or is not supported by the evidence it is reversible, and the trial court has no discretion to reach the wrong result." Pruitt v. State , 834 N.E.2d 90, 104 (Ind. 2005).
[10] "A juvenile charged with delinquency is entitled to have the court apply those common law jurisprudential principles [that] experience and reason have shown are necessary to give the accused the essence of a fair trial." In re K.G ., 808 N.E.2d 631, 635 (Ind. 2004) (citing In re Gault , 387 U.S. 1, 30, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) ). "Without question, these include ... the constitutional privilege against self-incrimination[.]" Id. "In protection of the rights against self-incrimination, the United States Supreme Court's opinion in Miranda v. Arizona , established that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' " P.M. v. State , 861 N.E.2d 710, 713 (Ind. Ct. App. 2007). Such procedural safeguards include an advisement to the accused that he has the right to remain silent and that anything he says can be used against him." Id.
[11] We have previously reiterated that "[t]he special status accorded juveniles in other areas of the law is fully applicable in the area of criminal procedure." S.D. v. State , 937 N.E.2d 425, 429 (Ind. Ct. App. 2010), trans. denied . "To give effect to that status in the context of waiving intricate, important, and long established Fifth ... Amendment rights, we require that a juvenile be afforded a meaningful opportunity to consult with a parent or guardian before solicitation of any statement." Id. That is, in cases where a juvenile is subject to custodial interrogation, such child must be read his rights under Miranda and the State must obtain the waiver of such rights pursuant to the juvenile waiver statute. See I.C. § 31-32-5-1. As a general rule, however, Miranda warnings and the juvenile waiver statute attach only where a subject is both in custody and subject to interrogation. See S.D ., 937 N.E.2d at 430. Therefore, the threshold question becomes whether D.Z. was in custody, and if so, whether the questioning by the assistant principal constituted interrogation as recognized under the federal and state constitutions.
III. Custodial Interrogation in the Schoolhouse
[12] D.Z. contends he was subjected to a custodial interrogation because no reasonable juvenile who is called into the assistant principal's office and questioned behind closed doors regarding an ongoing investigation into vandalized bathrooms would have felt free to leave prior to being dismissed by the assistant principal. In response, the State asserts that the assistant principal was merely conducting a disciplinary investigation, which resulted in the imposition of school discipline.
[13] The purpose of Miranda is to dispel the inherently coercive effect of police custody and interrogation. Miranda , 384 U.S. at 467, 86 S.Ct. 1602. "[T]he special procedural safeguards outlined in Miranda are not required where a suspect *600 is simply taken into custody, but rather where a subject in custody is subjected to interrogation." Rhode Island v. Innis , 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). "Interrogation has been defined as a process of questioning by law enforcement officials which lends itself to obtaining incriminating statements." S.D ., 937 N.E.2d at 430. "Under Miranda , 'interrogation' includes express questioning and words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect." White v. State , 772 N.E.2d 408, 412 (Ind. 2002) (citing Innis , 446 U.S. at 301, 100 S.Ct. 1682 ). The United States Supreme Court has held that the safeguards outlined in Miranda also apply to the functional equivalent of interrogation by the police. Innis , 446 U.S. at 301-02, 100 S.Ct. 1682.
[14] Whether a person is in custody depends upon objective circumstances, not upon the subjective views of the interrogating officers or the subject being questioned. Gauvin v. State , 878 N.E.2d 515, 520 (Ind. Ct. App. 2007), trans. denied . For an interrogation to be custodial in nature, one does not necessarily have to be under arrest. S.D ., 937 N.E.2d at 430. To be custodial in the non-arrest context, the interrogation must commence after the person's freedom of action has been deprived in a significant way. Id. This is determined by examining whether a reasonable person in similar circumstances would believe he is not free to leave. Luna v. State , 788 N.E.2d 832, 833 (Ind. 2003).
[15] While the determination as to whether a student is in custody and in need of Miranda safeguards is easily solved when the student is at the stationhouse, whether these same concerns that powered the Miranda decision are present in the modern schoolhouse setting is a more intricate question. This court previously provided a thorough analysis of the law concerning the issue in S.G. v. State , 956 N.E.2d 668 (Ind. Ct. App. 2011), trans. denied , where we summarized prior Indiana cases that addressed the issue of whether a student was in custody when questioned at his or her school, including State v. C.D ., 947 N.E.2d 1018 (Ind. Ct. App. 2011) ; G.J. v. State , 716 N.E.2d 475 (Ind. Ct. App. 1999) ; and S.A. v. State , 654 N.E.2d 791 (Ind. Ct. App. 1995), trans. denied, disapproved on other grounds by Alvey v. State , 911 N.E.2d 1248, 1250 (Ind. 2009). In each case, the appellate court held that there was no Miranda violation. In S.A., we found that there "was no coercive atmosphere to protect against" where "the questioning took place in the school building, by the vice-principal, and a major portion of it occurred in the presence of the student's father." S.G . 956 N.E.2d at 677. In G.J. , juvenile G.J. was questioned by the dean in the dean's office regarding whether he had brought marijuana to school. Id. The record did not indicate if an officer was present in the dean's office during questioning. Id. In C.D., a high school student was suspected of being "under the influence of some substance." Id. at 677. Following an investigation in the principal's office by a police officer, who was trained as a drug recognition evaluator, this suspicion was confirmed and C.D. was considered to be under the influence of marijuana. Id. at 677. A search of C.D.'s backpack by the principal revealed a controlled substance. Id. This court determined that the principal's action fell within the ambit of "an educational purpose" and that "C.D.'s examination was intended to carry out an educational function or school purpose, not to further a criminal examination." Id. at 677-78. Because the officer examined C.D. at the principal's request and in his presence, the investigation "did not transform [ ] into a custodial interrogation." Id. Nevertheless, *601 since we issued S.G. , the educational landscape has undergone some significant changes.
[16] There can be no dispute that the task of safeguarding children in our schools and maintaining appropriate discipline is an issue of paramount public importance. Education is mandatory, and we entrust our children to the school system, believing that they will be in an environment that is clean, safe, and conducive to learning. Every parent, indeed, all of society, expects this. However, "[w]alking the halls of America's public schools today, one should not be surprised to see a police officer." Paul Holland, Schooling Miranda: Policing Interrogation in the Twenty-First Century Schoolhouse , 52 Loy.L.Rev. 39, 1 (2006). In recent years, the presence of police in schools has changed more than just the frequency and nature of interactions between students and police and many schools have instituted 'zero tolerance' for school behavior. Id. ; See N.C. v. Com ., 396 S.W.3d 852, 863 (Ky. 2013). When viewed in protecting innocent children, this certainly has merit. But the use of zero tolerance has caused a dramatic shift away from traditional in-school discipline towards greater reliance on juvenile justice interventions. N.C ., 396 S.W.3d at 863. Such policies, which emphasize criminal charges, can serve to change the nature of questioning a student for purposes of school discipline into a criminal investigation. Id. In light of this changing educational landscape, school administrators have altered their activities to collaborate more actively with police officers. Id. In fact, school administrators in Indiana, under auspices of the Indiana Department of Education, as well as in several states across the country, are being instructed in law enforcement techniques of interviewing and interrogation.[2]
[17] Just as a school cannot pretend ignorance of the rules of criminal procedure, neither can police officers ignore, as beyond their responsibility, the ways in which school administrators take advantage of their presence and actions. See Holland, Schooling Miranda , at 15. Police officers are not divested of their law enforcement authority when they enter schools; schools employ them precisely because they wield this authority. Id. at 17. As such, the presence of law enforcement in schools on a daily basis serves notice that crimes will be charged for conduct the officer believes violates the law. N.C. , 396 S.W.3d at 864. This is not inappropriate, but it does change the nature of questioning a child for school discipline purposes to an improper police interrogation absent constitutional safeguards. Id.
[18] "[O]ther states have extended the concept of custody to school situations in which a school official, rather than a police officer, does the questioning, holding that the officer's pervasive presence can significantly increase[ ] the likelihood [that the student] would produce an incriminating response to the principal's questioning." S.G. , 956 N.E.2d at 678-79. In N.C ., the student admitted to giving hydrocodone to another student, in response to questioning by the assistant principal who was working in conjunction with the school resource officer. N.C., 396 S.W.3d at 854.
*602 The officer was present during the discussion. Id. After the assistant principal informed N.C. that he was subject to school discipline, the assistant principal left the room, leaving N.C. with the officer. Id. The officer then informed N.C. that he would be charged with a crime. Id. At no time was N.C. advised that he was free to leave, was given Miranda warnings, nor were his parents called. Id. Recognizing that a proper balance has to be struck between "the important public policy concerns of educators and parents to provide an appropriate and safe school environment while still protecting the individual rights of a child," the Kentucky supreme court held that
any statement obtained may not be used against a student as a basis for a criminal charge when law enforcement is involved or if the principal is working in concert with law enforcement in obtaining incriminating statements, unless the student is given the Miranda warnings and makes a knowing, voluntary statement after the warnings have been given.
Every custodial interrogation, when law enforcement is involved will not necessarily invoke the giving of Miranda warnings, for example, if the matter purely concerns school discipline. There are many school disciplinary matters where the presence of the law enforcement officer will maintain order and create a safer environment for the administrator and student. However, statements obtained without giving Miranda warnings are subject to suppression if a criminal charge is brought.
Certainly, all trained law enforcement officers know how to give Miranda warnings and to ensure that the school officer and the child are aware when criminal charges may be triggered. This is not an undue burden when measured against the consequences a child faces in the juvenile justice system or the adult criminal system, which clearly can be punitive. And, this protection does not prevent a school official from filing a criminal complaint, though the voluntariness of any confession remains a question of law for the court in every case, even if Miranda warnings have been given.
Id. at 864, 865 ; see also State v. Antonio T ., 352 P.3d 1172, 1179 (N.M. 2015) ; In re K.D.L ., 207 N.C.App. 453, 700 S.E.2d 766, 772 (2010).
[19] Turning to the facts before us, we conclude that D.Z. was submitted to a custodial interrogation at which he should have been advised of his rights pursuant to Miranda . The evidence establishes that after Dowler and Officer Flynn's investigation was complete and a suspect was identified, Dowler called D.Z. to his office for a discussion. The assistant principal questioned D.Z. in his office with the door closed. No reasonable student would have believed that he was at liberty to leave the office-it is undeniable that juveniles are susceptible to the influence of authority figures and the constraining effect of being in a controlled setting of a school, where "disobedience [can be] cause for disciplinary action." J.D.B. v. North Carolina , 564 U.S. 261, 276, 131 S.Ct. 2394, 2405, 180 L.Ed.2d 310 (2011). As such, the circumstances of a school setting-where a refusal to comply with the request or command of school officials can have far-reaching consequences, including potential criminal charges-have become inherently more coercive recently than ever before in the past.[3]
*603 [20] Although on its face appearing to be a school disciplinary proceeding, the 'discussion' between Dowler and D.Z. amounted in essence to an interrogation, geared towards a criminal proceeding. When Dowler reported the "mischief of vandalism and graffiti" to Officer Flynn and requested his assistance with the ongoing investigation, the school and law enforcement investigations became inextricably intertwined and Dowler was aware that criminal charges could ensue. (Tr. p. 17). In his office behind closed doors, Dowler explained the nature and method of the investigation to D.Z. After D.Z. made the incriminating statements, Dowler ended the conversation, imposed a five-day school suspension, and immediately informed Officer Flynn, who was waiting outside Dowler's office, of D.Z.'s admission. Without advising D.Z. of his Miranda rights, Officer Flynn proceeded to interrogate the student. Conceding that the officer should have Mirandized D.Z., the State now relies on D.Z.'s statements to the assistant principal as the basis to bring criminal charges against him. This sequence of events strongly suspects that the assistant principal and the officer were purposefully exploiting the school administrator's assumed ability to question without warnings and raises troubling echoes of the "confession-first" mode of interrogation found problematic by our United States Supreme Court in Missouri v. Seibert , 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).[4] If we no longer allow the Seibert interrogation technique in the stationhouse, why should we bless it in the schoolhouse?
[21] Police officers cannot avoid their duty under Miranda by attempting to have someone act as their agent in order to bypass the Miranda requirements. Sears v. State , 668 N.E.2d 662, 668 (Ind. 1996), overruled on other grounds Scisney v. State , 701 N.E.2d 847 (Ind. 1998). All relevant factors indicate that D.Z. was in custody and deprived of his freedom. He was being interrogated by Dowler in an effort to elicit incriminating statements about vandalizing the restroom without being informed of his rights, and he confessed without full knowledge of the consequences for so doing. Because the assistant principal and Officer Flynn acted in concert in obtaining these incriminating statements, and both were aware of the probability of criminal charges, D.Z. should have been advised of his Miranda rights. Absent these warnings, the juvenile court abused its discretion in admitting D.Z.'s statements to the assistant principal. As a consequence, we conclude that the State cannot establish beyond a reasonable doubt that D.Z. committed criminal mischief, if committed by an adult. We reverse the juvenile court's finding of delinquency.
CONCLUSION
[22] Based on the foregoing, we conclude that the juvenile court abused its discretion when it admitted D.Z.'s incriminating statements to a school official, who was working in cooperation with law enforcement.
[23] Reversed.
[24] Baker, J. concurs with separate concurring opinion
[25] Brown, J. dissents with separate opinion

Miranda v. Arizona , 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

On October 26, 2017, and November 9, 2017, the Indiana Department of Education advertised "training" in the Reid Technique of Interviewing and Interrogation for school administrators, with a focus on:
Reid Nine Steps of Interrogation: review the interrogation process, beginning with how to initiate the confrontation, develop the interrogational theme, stop denials, overcome objections, and use the alternative question to stimulate the admission.
Indiana Department of Education , http://www.doe.in.gov/safety/reid-technique-interviewing-and-interrogation-oct-26 (last visited Jan. 29, 2018).

A student's fear of arrest for refusing to obey the directives of an authority figure at school is not unreasonable given the frequency with which school-based arrests for such refusals and other misconduct are documented in the mainstream media.

In Seibert , the United States Supreme Court ruled that a police protocol to intentionally proceed without Miranda warnings until after an incriminating statement has been rendered, caused post-Miranda statements to be inadmissible. Missouri v. Seibert , 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).