Brown, Judge, dissenting.
[28] I respectfully dissent from the majority's conclusion that the court abused its discretion by admitting D.Z.'s statements to assistant principal Dowler when school resource officer Flynn was not present in the school office, and where there is no evidence that Dowler was acting as an agent of the police.
[29] Ind. Code § 20-33-8-10 provides that a "principal may take action concerning the principal's school or a school activity within the principal's jurisdiction that is reasonably necessary to carry out or prevent interference with an educational function or school purposes."[5] School purposes are defined as "the purposes for which a school corporation operates, including... [t]o promote knowledge and learning generally [and] [t]o maintain an orderly and effective educational system." Ind. Code § 20-33-8-4. D.Z.'s graffiti appeared in four different boys' bathrooms, made explicit reference to lewd sexual acts, and derogatorily targeted seventeen female students of the classes of 2017, 2018, and 2019, four or five with whom D.Z. had class. Unfortunately, pictures were taken of these messages and shared on social media and two girls found out that they were the subject of the graffiti before the school could remove it. Viewed from a schoolhouse perspective, D.Z.'s actions interfered with the maintenance of an orderly and effective educational system, Dowler's February and March investigation was an attempt to identify the cause of the interference, and his discussion with D.Z. was an attempt to restore order. See Linke v. Northwestern Sch. Corp. , 763 N.E.2d 972, 982 (Ind. 2002) ("However, a preventative or rehabilitative search conducted by a school corporation is substantively different than a search conducted to enforce the law. A preventative or rehabilitative search is inherent to a school corporation's function. Students generally understand that the 'preservation of ... a proper educational environment requires close supervision' and thus the intrusion on privacy is less severe.") (quoting New Jersey v. T.L.O. , 469 U.S. 325, 349-350, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) ).
*605 [30] To the extent that the majority asserts that school and law enforcement investigations became "inextricably intertwined" or that Dowler's questioning amounted to an "interrogation, geared toward a criminal proceeding," the record does not indicate that Dowler acted as Officer Flynn's agent in an attempt to bypass any Miranda requirements. See S.G. v. State , 956 N.E.2d 668, 680 (Ind. Ct. App. 2011). Cf. Sears v. State , 668 N.E.2d 662, 668 (Ind. 1996) ("The purpose of Miranda is to dispel the inherently coercive effect of police custody and interrogation. Based on this rationale, it has also been held to apply to police custody and the functional equivalent of interrogation by the police. The police also cannot avoid their duty under Miranda by attempting to have someone act as their agent in order to bypass the Miranda requirements." (internal citations omitted) ), overruled on other grounds by Scisney v. State , 701 N.E.2d 847 (Ind. 1998). Rather, the situation here is similar to that in State v. C.D. , where an investigation, first initiated by a school official, is subsequently assisted by a law enforcement officer, who is not independently investigating the matter. 947 N.E.2d 1018, 1023 (Ind. Ct. App. 2011) ("[Officer] Richhart was not independently investigating the matter. Instead, Richhart examined C.D. at [school official] Vanwanzeele's request and in Vanwanzeele's presence."). Here, only Dowler and academic coach Zack Baldwin took photographs of the graffiti. Dowler personally reviewed the video footage from specific days to identify "who was where" and took still images from the video. Transcript Volume 2 at 54. He testified the investigation's "focus was finding out who was doing the graffiti," that he "went back to [the] date and time [of finding each graffiti] and ran through the video of the window and, sure enough, it had [D.Z] entering and exiting at the time the writing was not on the wall and the time the writing was on the wall," and that he called D.Z. in to have a discussion with him "once [he] had realized that [D.Z.] was a part of each video that [he] had went back and looked at." Id. at 54-55, 72-73. Dowler had spent many hours investigating the graffiti on his own before asking Officer Flynn to join him "a little bit before" March 15, 2017. Id. at 55. Officer Flynn testified that Dowler
indicated that there had been graffiti-it was kind of on-going for several months and he had been investigating it, looking into it. The custodians would find it and let him know that it was found, and so, they had very broad time frames. So, when it came to me, he said hey, this has been on-going for a while and, so, I kind of stepped in at that point to help him narrow down that investigation and get some time frames that could be more helpful.
Id. at 17-18. When asked if he controlled the surveillance personally, set it up, or reviewed the videos afterwards on a regular basis, Officer Flynn testified, "I don't maintain it. I do review the videos frequently," and that he did not recall whether he discussed with Dowler the possibility that there could be criminal charges resulting from the graffiti. Id. at 19. Dowler also responded "[n]ot that I remember" when asked if "at any time while you were investigating the graffiti, did you discuss a criminal investigation." Id. at 55.
[31] When it came to speaking with then-seventeen-year-old D.Z., Dowler stated to Officer Flynn that he wanted to speak to D.Z. by himself because he "had a rapport with him" and wished to have the "conversation without [Officer Flynn] present." Id. at 43. Dowler questioned D.Z. at seventh period in his office with the door closed. Id. at 55-56. When asked if D.Z. was "free to leave your office during the discussion ... [c]ould he have gotten up and walked out if he wanted to," Dowler *606 answered, "I wouldn't have held him." Id. at 57. He testified similarly that D.Z. was allowed to go home with the other students when they were dismissed. When asked about the nature of the conversation in his office, Dowler testified:
Yes. What I had, is I had first told [D.Z.] what I had seen. That I had been tracking some restroom graffiti and that I kind of zeroed in and had seen that he had been in some of the restrooms that the graffiti was found and that I had kinda closed the gap, so to speak, on when the graffiti was written and that I had video of him going into and coming out of those restrooms where the graffiti was not before in that little time frame that we had and, therefore, I knew that he was the one that was responsible for graffiti on the wall. At that moment, I kinda went into the question of is there a reason why you did this. Did you write this because you had hard feelings towards girls or something of that nature. His comment was no, I don't know why I did it. I didn't have anything against them of any sort. So, then it just became why would you do this and it became just a basic conversation of he really didn't have a reason and, so, I just kind of said okay, what you did was wrong so we're going to have to definitely take care of it. You know, we're gonna have to take care of it and work on it from here.
Id. at 61-62. Dowler explained to D.Z. that he faced a consequence of five days of suspension out of school. Id. at 63. Officer Flynn testified that he did not direct Dowler in any questioning, that when Dowler decided to bring in D.Z. for questioning, he was not in the office at the time of questioning, that he had a conversation with D.Z. after Dowler's conversation, and that he entered Dowler's office only after Dowler had exited, spoke to D.Z., and eventually let D.Z. know he was being charged.
[32] While it may be true that schools are different than they used to be, I would hold on these facts as this Court did in C.D ., 947 N.E.2d at 1022-1023 ; S.G. , 956 N.E.2d at 679-680 ; and G.J. v. State , 716 N.E.2d 475, 477 (Ind. Ct. App. 1999), and find that no Miranda violation occurred in the statements made to Dowler outside the presence of Officer Flynn and affirm the trial court's finding.

Educational function is defined as the "performance by a school corporation or its officers or employees of an act or a series of acts in carrying out school purposes." Ind. Code § 20-33-8-2.